## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AMALGAMATED TRANSIT UNION, INTERNATIONAL, 10000 New Hampshire Avenue Silver Spring, MD 20903, | ) ) ) ) ) | |
| AMALGAMATED TRANSIT UNION, LOCAL 192, 8460 Enterprise Way Oakland, CA 94621, | ) ) ) ) | Civil Action No. 1:25-cv-03872 |
| AMALGAMATED TRANSIT UNION, LOCAL 256, 2776 21st Street Sacramento, CA 95818, | ) ) ) ) ) | |
| AMALGAMATED TRANSIT UNION, LOCAL 265, 1590 La Pradera Drive Campbell, CA 95008, | ) ) ) ) ) | |
| AMALGAMATED TRANSIT UNION, LOCAL 1277, 1744 N. Main Street Los Angeles, CA 90031, | ) ) ) ) ) | |
| AMALGAMATED TRANSIT UNION, LOCAL 1574, 1153 Chess Drive, # 203 Foster City, CA 94404, | ) ) ) ) ) | |
| AMALGAMATED TRANSIT UNION, LOCAL 1575, 165 North Redwood Drive, Suite 285 San Rafael, CA 94903, | ) ) ) ) ) | |
| AMALGAMATED TRANSIT UNION, LOCAL 1605, 1333 Pine Street, Suite G Martinez, CA 94553, | ) ) ) ) ) | |
| and | ) ) | |

AMALGAMATED TRANSIT UNION,       )
LOCAL 1704,                      )
1845 Business Center Drive, Suite 224  )
San Bernardino, CA 92408,       )
                                )
                                )
                                )
            Plaintiffs,          )
                                )
        v.                       )
                                )
UNITED STATES DEPARTMENT OF LABOR,  )
200 Constitution Avenue, NW      )
Washington, DC 20210,           )
                                )
            and                  )
                                )
LORI CHAVEZ-DEREMER, in her official  )
capacity as SECRETARY OF THE     )
UNITED STATES DEPARTMENT OF LABOR,  )
200 Constitution Avenue, NW      )
Washington, DC 20210,           )
                                )
            Defendants.          )
_____)

**<u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>**

## INTRODUCTION

1.      This lawsuit against the United States Department of Labor and its Secretary (collectively, "DOL") raises a pure question of statutory interpretation: Does the State of California's legislative diminishment of a pre-existing right of public transit employees to bargain collectively over defined-benefit pensions run afoul of the "continuation of collective bargaining rights" condition set forth in Section 13(c)(2) of the Urban Mass Transportation Act of 1964 ("UMTA"), 49 U.S.C. § 5333(b)(2)(B), for the provision of federal transit grants to public transit agencies, thus leaving the DOL with no choice but to withhold the certification of compliance necessary to allow such grant money to be disbursed to California transit agencies?

2.      There is only one appellate decision on the books exploring the scope of the DOL's statutory authority under Section 13(c)(2): this Circuit's decision in *ATU v. Donovan*, 767 F.2d 939 (D.C. Cir. 1985). Under the analytical framework established by that decision, the clear answer to the pure question of statutory interpretation presented by this lawsuit is "yes": California's diminishment of a preexisting right of public transit employees to bargain collectively over their defined-benefit pensions runs afoul of Section 13(c)(2) and the DOL thus has no choice but to withhold certifications of compliance to the California transit agencies.

3.      On March 31, 2025, the Trump Administration DOL found, in a decision departing from prior decisions of the Obama and Biden Administration DOLs, that the Plaintiff Unions' objections to several local California transit agencies' grant applications were not "sufficient" within the meaning of 29 C.F.R. § 215.3(d)(3). *See* Ex. 1. The Unions had objected to certification on the ground that a California statute prevented California transit agencies from complying with Section 13(c)(2)'s "continuation of collective bargaining rights" condition on the provision of such grants, thus precluding the DOL from approving or "certifying" those grants. Since March 31,

2025, DOL has found similar objections not "sufficient" for grants to other California transit agencies on at least forty-two occasions. *See, e.g.*, Ex. 2.

4.     After finding the objections insufficient, between April 1 and September 12, 2025, the DOL issued Certifications of Employee Protective Provisions ("Certifications") to these California transit agencies, stating that the "protective arrangements" described in the agencies' grant applications "provide protections that satisfy the requirements of 49 U.S.C. § 5333(b)." *See, e.g.*, Ex. 3 at 1. This lawsuit challenges those Certifications as being in excess of the DOL's statutory authority under Section 13(c)(2), and contrary to that law, as definitively interpreted in *ATU v. Donovan*.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702.

6.     Venue lies in this District pursuant to 28 U.S.C. § 1391(e)(1) because the Defendants reside in this District and because a substantial part of the events giving rise to ATU's claim occurred in this District.

## PARTIES

7.     The lead Plaintiff Amalgamated Transit Union, International ("International") is an international labor organization with numerous affiliated local unions that together represent approximately 200,000 active and retired transit workers throughout the United States and Canada. Employees and retirees of public transit agencies, both state and local, make up over 80% of ATU's membership.

8.     Plaintiffs Amalgamated Transit Union, Locals 192, 256, 265, 1277, 1574, 1575, 1605, and 1704 are local unions affiliated with the International. The Plaintiff ATU local unions

represent approximately 10,980 public transit agency employees in the State of California. The federal statutory provision at issue here, Section 13(c) of the UMTA, was enacted to protect the collective bargaining rights of public transit employees. The Plaintiff ATU locals, as the collective bargaining representatives of California transit employees, are the entities through which those public transit employees exercise their statutorily protected collective bargaining rights. Unless otherwise noted, this complaint will refer to Plaintiff International and the Plaintiff ATU locals collectively as "ATU."

9.  Defendant DOL is the federal agency charged with various responsibilities under Section 13(c) of the UMTA, including, to the extent relevant here, the non-discretionary statutory responsibility to ensure—as a condition for the provision of federal mass transit grants to California transit agencies and other state and local transit agencies—that those transit agencies preserve and continue the collective bargaining rights of their unionized transit employees.

10.  Defendant Lori Chavez-DeRemer is the Secretary of the United States Department of Labor and is sued in her official capacity as such.

## FACTS

### A. Section 13(c) of the UMTA

11.  Section 13(c) of the UMTA requires—as an express condition for the United States Department of Transportation's provision of federal mass transit assistance (typically in the form of capital improvement or operating grants) to state and local transit agencies—that the interests of public employees affected by that federal mass transit assistance be protected under arrangements the DOL certifies are fair and equitable. And those arrangements "shall include," among other things, such provisions as may be necessary for "the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective

bargaining agreements or otherwise," § 13(c)(1), and for "the continuation of collective bargaining rights," § 13(c)(2).

12.     Because under Section 13(c) the DOL's certification is an express condition for the provision of a federal mass transit grant sought by a state or local transit agency, the DOL's denial of certification has the effect of prohibiting the Department of Transportation from disbursing the requested funds, even if all other grant conditions have been met. Conversely, the DOL's issuance of a certification permits the disbursement of those funds.

**B.  California Public Employees' Pension Reform Act of 2013**

13.     In 2012, the State of California enacted into law, effective January 1, 2013, a pension reform statute titled the California Public Employees' Pension Reform Act of 2013, Cal. Gov't Code §§ 7522–7522.74, or "PEPRA" for short. PEPRA diminishes the right of public sector unions like ATU and the public employees they represent to bargain collectively over various aspects of defined-benefit pension plans covering those employees. A defined-benefit pension plan is a traditional employee benefit plan that—unlike defined contribution plans such as 401(k) plans—guarantees covered employees a fixed pension benefit upon their retirement based on a formula set out in the plan.

14.     PEPRA diminishes several collective bargaining rights. For example, whereas prior to PEPRA's enactment, public sector unions in California had the unfettered right to bargain over the amount of contributions (if any) that their represented employees would have to pay to satisfy the funding requirements of their defined-benefit pension plan, PEPRA mandates (and thus renders non-bargainable) that public employees hired on or after PEPRA's January 1, 2013, effective date contribute 50% of the normal cost of providing them a defined-benefit pension. *See id.* § 7522.30.

15.     Moreover, whereas prior to PEPRA's enactment, public sector unions in California had the unfettered right to bargain over the formulas used to determine the pension benefits that employees would receive upon their retirement, PEPRA mandates (and thus renders non-bargainable) that defined-benefit pensions provided to public employees hired on or after PEPRA's January 1, 2013, effective date be calculated in a manner that effectively "caps" those pensions, prohibiting, for example, previously negotiated formulas. *See, e.g.*, *id.* § 7522.10(c).

16.     PEPRA, furthermore, contains a provision (Cal. Gov't Code § 7522.34(c)) barring certain types of compensation (including payments for unused vacation, annual leave, personal leave, or sick leave, and overtime pay) from inclusion in the "pensionable compensation" amount used in calculating the defined pension benefit to which an employee hired on or after January 1, 2013, will be entitled upon retirement. Prior to PEPRA, parties could bargain over which forms of compensation were includable in pensionable compensation without regard for an employee's date of hire.

17.     PEPRA also modified state laws governing employee pensions for employees hired before January 1, 2013. *See id.* §§ 7522.46 (prohibiting purchase of nonqualified service credits), 31461(b) (excluding certain forms of compensation from pension calculation).

18.     In short, prior to PEPRA's enactment, ATU and other public sector unions in California were legally entitled to bargain for, and had in fact successfully bargained for, the establishment of defined-benefit pension plans that, on balance, provided substantially more favorable pension terms (including terms regarding employee contributions to any pension plan) than the terms available under PEPRA, especially for employees hired on or after PEPRA's January 1, 2013 effective date.

C. <u>**Prior DOL Determinations and Related Federal Court Proceedings**</u>

19.    Shortly after PEPRA's enactment, a California transit agency, Sacramento Regional Transit District ("SacRTD"), applied for a federal mass transit grant. At or around the same time, the California Department of Transportation ("Caltrans") applied for a grant on behalf of Monterey-Salinas Transit ("MST"), another California transit agency.

20.    Under procedures established by the DOL and codified at 29 C.F.R. Part 215, a public-sector transit union may file objections to the DOL's certification of a grant under Section 13(c) of the UMTA. ATU filed such objections on behalf of its affiliated locals to the certification of the grants sought by SacRTD and by Caltrans on behalf of MST, arguing, *inter alia*, that because PEPRA diminishes the right of California transit employees to bargain collectively over various aspects of defined-benefit pension plans covering those employees, the DOL was precluded by Section 13(c)(2) from certifying the grants.

21.    In a pair of decisions dated September 4, 2013 and September 30, 2013, respectively, the Obama Administration DOL sustained ATU's objections and denied certification of the grants. In doing so, and to the extent relevant here, the Obama Administration DOL found that this Circuit's "exhaustive decision" in *ATU v. Donovan* was a "controlling" decision that precluded the DOL from certifying the grants as a matter of law. In other words, the DOL found that under *ATU v. Donovan*, it had no choice but to deny certification of the grants because PEPRA ran afoul of Section 13(c)(2)'s continuation-of-collective-bargaining-rights condition for the provision of federal grants to public transit agencies. As a result of those denials, neither SacRTD nor MST received the federal grant money sought at that time.

22.    The Obama Administration DOL's decisions denying certification based on ATU's PEPRA-based objections in 2013 sparked two immediate actions by the State of California. First,

California enacted emergency legislation (S.B. 13, 2013 State Leg., Reg. Sess. (Cal. 2013)) temporarily exempting transit employee pension plans from PEPRA. This emergency legislation, as subsequently amended, provided that the temporary exemption would expire on the earlier of a ruling by a federal district court that the DOL had erred in determining that the application of PEPRA to transit employee pension plans precludes certification under Section 13(c), or January 1, 2015. Alternatively, the temporary exemption would become permanent upon a ruling by a federal district court upholding the DOL's determination that the application of PEPRA to transit employee pension plans precludes certification under Section 13(c).

23.    Second, California, joined by SacRTD, brought a lawsuit in the United States District Court for the Eastern District of California seeking, *inter alia*, a judicial ruling that the DOL had erred in determining that the application of PEPRA to transit employee pension plans precludes certification under Section 13(c).

24.    By order dated December 30, 2014, the California district court ruled that the DOL had violated the Administrative Procedure Act ("APA") by failing adequately to explain the reasons supporting its determination that the application of PEPRA to transit employee pension plans precludes certification under Section 13(c), and the district court remanded the matter to the DOL for further proceedings consistent with this ruling.

25.    On remand, the DOL reaffirmed and adhered to its earlier determination that the application of PEPRA to transit employee pension plans precludes certification under Section 13(c)—providing further legal reasoning in support of that determination in a pair of decisions dated August 13, 2015. California thereupon filed an amended complaint challenging the DOL's reaffirmance and adherence to its earlier determination.

26.     After another two-and-half years of litigation, the California district court once again found the DOL's explanation for its determination inadequate, but rather than remand the matter to the DOL a second time, the district court granted summary judgment in California's favor in a final order entered on January 25, 2018. However, in that final order, the district court denied California's request for a broad permanent injunction that would have prevented the DOL from "using" PEPRA "to deny [§] 13(c) certification to any California transit agency." Instead, the district court entered a much narrower permanent injunction preventing the DOL "from relying on PEPRA, as currently enacted, to deny the State's application for funding under . . . [§ 13(c)]" *only* "to the extent the State intends the funds to benefit MST or SacRT[D]."

27.     Following a change in presidential administrations, the first Trump Administration DOL appealed the California district court's final order to the Ninth Circuit, but it later successfully moved voluntarily to dismiss that appeal. Subsequently, that Trump Administration DOL reversed the position taken by the Obama Administration DOL and "concluded that PEPRA does not present a bar to certification under section 13(c)." Ex. 1; *see also* Ex. 4.

28.     On that basis, the first Trump Administration DOL certified a series of transit grants sought by California transit agencies not otherwise entitled to DOL certification under the narrow permanent injunction issued by the California district court, thereby not sustaining ATU's objections that PEPRA's diminishment of the right to bargain collectively over defined-benefit pensions precluded the DOL from certifying those grants.

29.     ATU thereupon sued the first Trump Administration DOL in this forum challenging its reversal of position and resulting certification actions. California intervened in that ATU lawsuit and successfully moved for a transfer of ATU's lawsuit to the United States District Court for the Eastern District of California.

30.     After yet another year-and-a-half of litigation in the California district court, the Biden Administration DOL issued a letter determination in which the agency returned to the original position taken by the Obama Administration DOL on the pure issue of statutory interpretation presented. That reversion precipitated an effective realignment of the parties, with California filing a cross-complaint against the Biden Administration DOL and ATU intervening on the Biden Administration DOL's side of the dispute.

31.     On cross-motions for summary judgment, the California district court ruled against the Biden Administration DOL and ATU on the pure issue of statutory interpretation presented, and both parties appealed to the Ninth Circuit. In an unpublished memorandum opinion, a Ninth Circuit merits panel held, over the objection of all parties, that the statutory-interpretation question that had been the subject of more than a decade of district court litigation and DOL review spanning three presidential administrations was not "prudentially ripe" for decision. *See ATU v. DOL*, No. 23-15503, 2024 WL 3565264, at *1 (9th Cir. July 29, 2024). On that basis, the Ninth Circuit panel vacated the district court decision below and remanded the case to the district court with instructions that it be dismissed on jurisdictional grounds.

**D.  The Agency Actions Challenged in This Lawsuit**

32.     Thereafter, several California transit agencies not otherwise entitled to certification of transit grants under the narrow permanent injunction issued by the California district court in 2018 submitted applications for transit grants. ATU objected to the DOL's certification of those transit grants on the ground that PEPRA's interference with the continuation of collective

bargaining rights—and diminishment of the right to bargain collectively over defined-benefit pensions—precludes such certification. *See, e.g.*, Ex. 5 (attachments omitted).

33.    The grants for which ATU objected to the DOL certification include Alameda-Contra Costa Transit District (grant application CA-2025-022); Central Contra Costa Transit Authority (grant application CA-2025-016); Golden Gate Bridge, Highway and Transportation District (grant application CA-2025-185); Long Beach Public Transportation Company (grant application CA-2025-055); Los Angeles County Metropolitan Transportation Authority (grant application CA-2025-078); Omnitrans (grant application CA-2025-060); Riverside Transit Agency (grant application CA-2025-018); San Mateo County Transit District (grant application CA-2025-235); Santa Clara Valley Transportation Authority (grant application CA-2025-175); and SunLine Transit Agency (grant application CA-2025-136).

34.    ATU's objections were filed between January 29, 2025 and September 3, 2025.

35.    Specifically, ATU objected to the DOL certifying grants to these transit agencies on the ground that PEPRA precluded the DOL from certifying the transit agencies' compliance with Section 13(c)(2).

36.    On March 31, 2025, the Trump Administration DOL did not sustain ATU's PEPRA-based objections to certifying grants to the Alameda-Contra Costa Transit District, the Central Contra Costa Transit Agency, and the Riverside Transit Agency. In a brief explanation for its change of position (*see* Ex. 1), the Trump Administration DOL stated that the DOL "no longer adheres to the" statutory interpretation expressed by the Biden Administration DOL in 2021 (and by the Obama Administration DOL previously), but "instead agrees with the views stated" by the prior Trump Administration DOL in 2019. According to the agency, "[t]he 2019 [Trump Administration] determination more persuasively explains that Congress intended the statute to

grant flexibility and discretion to the Department." The DOL added that, in its view, the 2021 statutory interpretation was "too rigid" and "unconvincingly relies on a slippery slope fallacy to argue that California's legislative modification to public sector pension plans means the discontinuation of collective bargaining rights."

37.    In its March 31, 2025 statement, the DOL further asserted "that California's changes to aspects of its pension plans do not sufficiently affect transit workers' benefits and do not interfere with the collective bargaining process between local transit agencies and their workers," and, moreover, "PEPRA does not impermissibly impair the collective bargaining process and leaves agencies and employees free to negotiate around PEPRA's effects and within its restrictions." The DOL called this the "better interpretation of Section 13(c)." On this basis, the DOL determined that ATU's objections were not "sufficient."

38.    On April 1, 2025, the DOL granted Certifications to the Alameda-Contra Costa Transit District (grant applications 2025-022-00; CA-2025-026-00; CA-2025-027-00; CA-2025-031-00); Central Contra Costa Transit Agency (grant application CA-2025-016-00); and Riverside Transit Agency (grant application CA-2025-018-00).

39.    Between April 1 and September 12, 2025, the DOL also did not sustain ATU's PEPRA-based objections to certifying additional grants to the above listed California transit agencies. The DOL stated that it "previously addressed the issue that [ATU] raise[d] in its March 31, 2025, response to objection (concerning Alameda-Contra Costa Transit District[,] . . . Central Contra Costa Transit Agency[,] . . . [and] Riverside Transit Agency). Therefore, no further action by the Department is required in this instance. The Department will proceed to certification in accordance with this decision." *See* Ex. 2.

40.     Between April 2 and September 12, 2025, the DOL certified grant applications from all of the above-listed California transit agencies, notwithstanding the application of PEPRA to these agencies.

## CAUSE OF ACTION: DOL'S CERTIFICATIONS DO NOT COMPLY WITH SECTION 13(C)(2)

(Under the APA, 5 U.S.C. §§ 701–706)

41.     The allegations in paragraphs 1–40 above are re-alleged and incorporated by reference herein.

42.     The current Trump Administration DOL's agency actions in which it issued a series of transit grant certifications over ATU's PEPRA-based objections are subject to judicial review under the APA. *See ATU v. Donovan*, 767 F.2d at 944–46.

43.     In issuing those transit grant certifications over ATU's PEPRA-based objections, the current Trump Administration DOL has acted contrary to law and in excess of its statutory authority, thus requiring the invalidation of the DOL's certification actions under Section 706 of the APA. Under this Circuit's interpretation of § 13(c)(2) in *ATU v. Donovan*, the DOL is precluded by law from certifying those transit grants.

## PRAYER FOR RELIEF

WHEREFORE, ATU respectfully requests that this Court:

(1)     Issue a declaratory judgment stating that the current Trump Administration DOL's agency actions in which it issued a series of transit grant certifications over ATU's PEPRA-based objections are contrary to law and in excess of the agency's statutory authority, and thus invalid under the APA;

(2)    Issue a permanent injunction: (a) directing the DOL to revoke each of the certifications it has issued over ATU's PEPRA-based objections; and (b) enjoining the DOL from issuing any further certifications over ATU's PEPRA-based objections.

(3)    Award ATU, pursuant to 28 U.S.C. § 2412(a)(1), the costs incurred in prosecuting this lawsuit; and

(4)    Order such other and further relief as the Court may deem appropriate.


Dated:  November 6, 2025                    Respectfully submitted,

                                            /s/Jacob Karabell
                                            Jacob Karabell, D.C. Bar # 996066
                                            Rachel S. Casper, D.C. Bar # 90017405
                                            BREDHOFF & KAISER, P.L.L.C.
                                            805 15th Street, N.W., Suite 1000
                                            Washington, DC 20005
                                            Telephone: (202) 842-2600
                                            jkarabell@bredhoff.com
                                            rcasper@bredhoff.com

                                            *Counsel for Plaintiffs*

# EXHIBIT 1

**U.S. Department of Labor**

Office of Labor-Management Standards
200 Constitution Ave., NW, N-5603
Washington, D.C. 20210



March 31, 2025

Daniel Smith
General Counsel
Amalgamated Transit Union
10000 New Hampshire Ave.
Silver Spring, MD 20903-1706

Re:      Alameda-Contra Costa Transit District – CA-2025-022-00; CA-2025-026-00;
CA-2025-027-00; CA-2025-031-00
Central Contra Costa Transit Agency – CA-2025-016-00
Riverside Transit Agency – CA-2025-018-00

Dear Mr. Smith:

This is in response to letters objecting to the Proposed Terms for Employee Protection Certification contained in the Department's referral letters for the above referenced grants. Pursuant to Department Guidelines (29 C.F.R. Part 215), your objections were timely received.

The Amalgamated Transit Union (ATU), on behalf of its affected locals, has objected to the Department's proposed certification on the ground that the Public Employees' Pension Reform Act of 2013 ("PEPRA"), Cal. Gov. Code § 7522 *et seq.*, precludes the Department from certifying the transit agencies' compliance with the condition that they continue collective bargaining rights as required by 49 U.S.C. § 5333(b)(2)(b) of the Federal Transit Act (also known as Section 13(c)(2) of the Urban Mass Transportation Act) in order to be eligible for this federal funding. ATU cites as support the various documents written by the Department and ATU over the years of litigation surrounding PEPRA and Section 13(c). As explained below, following a review of the materials submitted and the prior history, the Department has determined that the objections are not sufficient.

Only a brief summary of the extensive litigation regarding the Department's determinations about PEPRA is provided here.[1] In 2013, and again in 2015, the Department denied certification to grants for the Sacramento Regional Transit District (SacRTD) and the California Department of Transportation (Caltrans) on behalf of Monterey-Salinas Transit (MST) on the grounds that PEPRA did not allow for the "preservation of rights, privileges, and benefits (including continuation of pension rights and benefits under existing

---

[1] A more detailed summary of the relevant facts and procedural history can be found in the Department's prior determinations. *See* Attachments.

collective bargaining agreements or otherwise)" and the "continuation of collective bargaining rights" as required by Section 13(c). 49 U.S.C. § 5333(b)(2)(a), (b). In 2018, the U.S. District Court for the Eastern District of California enjoined the Department from relying on PEPRA to deny Section 13(c) certification to funding applications for the benefit of SacRTD or MST. *See California v. U.S. Dep't of Lab.*, 306 F. Supp. 3d 1180, 1190 (E.D. Cal. 2018).

In 2019, the Department issued a determination that reexamined its earlier position and concluded that PEPRA does not present a bar to certification under Section 13(c). Attachment B (2019 Determination). In 2021, while litigation over the 2019 Determination was still ongoing, the Department again reconsidered its position, concluding that PEPRA broadly precluded certification of grants to affected California transit agencies. Attachment A (2021 Reconsideration). The court issued a preliminary injunction halting the Department's implementation of the 2021 Reconsideration. *See ATU v. U.S. Dep't of Lab.*, No. 2:20-CV-00953-KJM-DB, 2021 WL 6002212, at *1 (E.D. Cal. Dec. 20, 2021). The court later issued a permanent injunction barring the Department from relying on PEPRA as a basis to deny Section 13(c) certification to California transit grants, although the court's decision was subsequently vacated by the Ninth Circuit on prudential ripeness grounds. *See ATU v. U.S. Dep't of Lab.*, 647 F. Supp. 3d 875 (E.D. Cal. 2022), *vacated and remanded*, No. 23-15503, 2024 WL 3565264 (9th Cir. July 29, 2024).

The Department no longer adheres to the views expressed in the 2021 Reconsideration and instead agrees with the views stated in the 2019 Determination, the reasoning of which is incorporated herein. The 2021 Reconsideration takes too rigid a view of the Department's authority and role under Section 13(c). The 2019 Determination more persuasively explains that Congress intended the statute to grant flexibility and discretion to the Department rather than have the Department reflexively incorporate NLRA precedent to a public sector setting. *See* Attachment B at 6–7. The 2021 Reconsideration also unconvincingly relies on a slippery slope fallacy to argue that California's legislative modification to public sector pension plans means the discontinuation of collective bargaining rights. *See* Attachment A at 9–10. The 2019 Determination more reasonably concludes that California's changes to aspects of its pension plans do not sufficiently affect transit workers' benefits and do not interfere with the collective bargaining process between local transit agencies and their workers. Attachment B at 7–9. As the 2019 Determination recognized, PEPRA does not impermissibly impair the collective bargaining process and leaves agencies and employees free to negotiate around PEPRA's effects and within its restrictions. *Id.* at 8; *see also ATU*, 647 F. Supp. 3d at 910 (noting evidence submitted by California to show "a number of transit agencies and their employees bargained over wage increases to make up for pension contribution increases, and they negotiated agreements to shore up underfunded pension plans").

The Department acknowledges that the departure from its views in the 2021 Reconsideration may unsettle expectations of interested parties. The Department does not believe that ATU and public transit workers could have reasonably engendered serious

reliance interests based on the 2021 Reconsideration due the Department's prior changes in view and the litigation history. The 2021 Reconsideration was preliminarily enjoined by the court before the Department applied it to new applications for transit funding. The Department's 2013 and 2015 determinations taking similar positions were likewise successfully challenged by California in court. As such, PEPRA's legal changes have now long been applicable to transit workers and formed part of the background assumptions in the collective bargaining negotiations between transit agencies and public transit workers. ATU may have hoped that California would change its pension laws in response to the Department's prior Section 13(c) views or a favorable court decision, but such hopes were speculative in nature. Even if ATU and transit workers had legitimate reliance interests on the Department's 2021 Reconsideration, their interests do not outweigh the Department's interest in applying the better interpretation of Section 13(c) expressed in the 2019 Determination.

The Department has no reason to conclude that PEPRA's impacts on the collective bargaining rights and benefits of the transit workers of the above-captioned transit agencies are any greater than previously assessed by the Department in the 2019 Determination or by the court in the previously litigated matters. As such, the Department has determined that ATU has not raised the kinds of material issues or changes in legal or factual circumstances that would make its objection "sufficient" within the meaning of 29 C.F.R. § 215.3(d)(3).

Sincerely,

Andrew C. Hasty, Acting Chief
Division of Interpretations and Regulations

Enclosures:    Attachment A
               Attachment B

**U.S. Department of Labor**     Office of Labor-Management Standards
Washington, D.C. 20210



June 14, 2019

Robert Molofsky, General Counsel
Amalgamated Transit Union
10000 New Hampshire Avenue
Silver Spring, MD 20903
Email: 13c@atu.org

Re:     RESPONSE TO OBJECTIONS TO EMPLOYEE PROTECTION TERMS
        FOR PENDING FTA GRANT APPLICATIONS
        CA-03-0806-04 and CA-90-Z117
        Sacramento Regional Transit District and Caltrans *on behalf of* Monterey-Salinas Transit;
          and
        Alameda-Contra Costa Transit District, CA-2017-017-01 and CA-2019-011;
        Golden Gate Bridge, Highway and Transportation District, CA-2019-041;
        Los Angeles County Metropolitan Transportation Authority, CA-2018-012-01 and CA-
        2018-093-01;
        Riverside Transit Agency, CA-2019-048;
        San Francisco Bay Area Rapid Transit District, CA-2019-029;
        San Joaquin Regional Transit District, CA-2019-034;
        San Mateo County Transit District, CA-2017-104-01;
        Santa Clara Valley Transportation Authority, CA-2018-081-01 and CA-2019-047

Dear Mr. Molofsky:

This is in response to your November 29, 2018 letter, in which Amalgamated Transit Union
(ATU) Local 1225 and Local 256 registered certain objections to the Proposed Terms for
Employee Protection Certification contained in the Department of Labor's (Department) referral
letters of November 16, 2018 for CA-03-0806-04 and CA-90-Z117.  This letter also responds to
ATU's objections to the other above captioned grant applications. Pursuant to Department
Guidelines (29 CFR Part 215), all of the objections were timely received.

With regard to grants CA-03-0806-04 and CA-90-Z117, ATU asserted that the Department's
sole rationale for proposing to certify the current grant is to comply with the decisions of the
U.S. District Court for the Eastern District of California.  *See California v. U.S. Dep't of Labor*,
306 F. Supp. 3d 1180 (E.D. Cal. 2018) (final decision).  ATU in turn objected to the
Department's proposed certification on the basis that it would be premature and improper to
certify the grant in order to comply with the district court's decisions given that an appeal is still
pending before the United States Court of Appeals for the Ninth Circuit.  ATU noted that while
the Department moved to voluntarily dismiss the appeal, ATU moved to intervene for the
purpose of taking over the Department's appeal.

1

After ATU submitted its objection, the Ninth Circuit denied ATU's motion to intervene and dismissed the appeal. ATU's objection regarding the pendency of the appeal is therefore moot. As such, the Department determines in accordance with the Guidelines at 29 C.F.R. § 251.3 that ATU's objection to CA-03-0806-04 and CA-90-Z117 is not sufficient.

Regarding the remaining grants, ATU objects to the Department's proposed certification due to PEPRA's (California Public Employees' Pension Reform Act (PEPRA), Cal. Gov't § 7522 et seq.,) effect on transit employees' collective bargaining rights.

In light of the district court's decisions, the Department has reexamined its earlier determinations denying certification pursuant to section 13(c) of the Urban Mass Transportation Act (UMTA), now codified at 49 U.S.C. § 5333(b) (hereinafter "section 13(c)"), to these grants because of the PEPRA's impact on transit employees. Based on that reexamination, the Department has concluded that PEPRA does not present a bar to certification under section 13(c).

## Background and Procedural History

The facts were set out in the Department's previous correspondence issued on September 4, 2013, September 30, 2013, and August 13, 2015. As such, only a brief summary of the relevant facts and subsequent procedural history is provided here.

The Sacramento Regional Transit District (SacRTD) and the California Department of Transportation (Caltrans) on behalf of Monterey-Salinas Public Transit System Joint Powers Agency d/b/a Monterey-Salinas Transit (MST) first submitted the grants at issue to the Federal Transit Administration in 2012. The Federal Transit Administration forwarded the grants to the Department with a request for certification pursuant to section 13(c), which requires that the Department certify that "fair and equitable" arrangements are in place to protect the interests of affected employees before state and local transportation agencies can receive federal mass transit funding assistance. *See* 49 U.S.C. § 5333(b). Those arrangements "shall include provisions that may be necessary for," *inter alia*, "the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise," and "the continuation of collective bargaining rights." 49 U.S.C. § 5333(b)(2)(A), (B).

The Department initially denied certification to SacRTD's application on September 4, 2013 and to MST's application on September 30, 2013, on the basis that PEPRA precluded certification. PEPRA, enacted in 2012, reformed California's public employee pension system and applies to most California public employees, including transit employees affected by these grants. Among other requirements, PEPRA mandates that public employees hired after 2013: contribute at least 50% of the cost of their pension benefits; establish minimum time-in-service requirements; caps the pension benefits they can receive; and prescribes the calculation of their pension benefits at retirement. PEPRA also changes some aspects of pensions for public employees hired before 2013, including ending employees' ability to purchase service credit for non-working time ("airtime"). SacRTD and MST transit employees had collective bargaining agreements in place in 2013 that provided defined benefit pension plans with more employee-favorable terms than

those permitted by PEPRA. The Department determined that PEPRA's unilateral changes to pension benefits without bargaining were inconsistent with section 13(c)(1)'s mandate to preserve pension benefits under existing collective bargaining agreements and section 13(c)(2)'s mandate to ensure continuation of collective bargaining rights.

The transit agencies sought review of the Department's determination in federal district court. In a December 30, 2014 decision, the court held that the Department's determinations were arbitrary and capricious. *California v. U.S. Dep't of Labor*, 76 F. Supp. 3d 1125 (E.D. Cal. 2014). Among the reasons the court provided was that the Department erred in "reflexively" relying on *Amalgamated Transit Union v. Donovan*, 767 F.2d 939 (D.C. Cir. 1985), in light of the factual differences between that case and the circumstances here, which involved "a state's system-wide changes in some aspects of public employment." 76 F. Supp. 3d at 1143. Additionally, the court found that the Department's conclusion that PEPRA prevented collective bargaining over pensions was erroneously premised on an assumption that a pension must necessarily be a defined benefit rather than a defined contribution plan. *Id.* at 1143. The court further stated that the Department was arbitrary and capricious in, *inter alia*, "fail[ing] to consider the realities of public sector bargaining," and in determining that not yet hired employees had rights under collective bargaining agreements. *Id.* at 1144-45. The court remanded the matter to the Department for further proceedings consistent with its decision. *Id.* at 1148.

On August 13, 2015, the Department issued new final determinations denying section 13(c) certifications. The Department explained its interpretation that the lessening or diminution of collective bargaining rights as accomplished by PEPRA violates section 13(c), drawing support from the statute's text, legislative history, and case law establishing that the commonly understood meaning of collective bargaining precludes unilateral changes to mandatory subjects of collective bargaining. The Department also explained its disagreement that the factors and issues identified by the court supported certification of the grants. The transit agencies challenged the new final determinations, and the district court ruled that they were arbitrary and capricious. *California v. U.S. Dep't of Labor*, 306 F. Supp. 3d 1180 (E.D. Cal. 2018) (hereinafter 2018 Decision); *California v. U.S. Dep't of Labor*, No. 2:13-CV-02069-KJM-DB, 2016 WL 4441221 (E.D. Cal. Aug. 22, 2016) (hereinafter 2016 Decision). The court found that the statutory text and legislative history of section 13(c) were ambiguous as to whether section 13(c)(2)'s provision requiring "the continuation of collective bargaining rights" protected those rights from a diminishing or lessening that fell short of elimination. 2016 Decision, 2016 WL 4441221, at *9-12, 15-17. The court noted, however, that the history of the statute suggested that the provision was "motivated primarily by larger-scale restrictions on collective bargaining rights." *Id.* at *17. The court also determined the Department erred in relying on case law establishing that even minimal unilateral changes by an employer could violate the statute because Congress' intent was not to apply all National Labor Relations Act (NLRA) law to states through the UMTA. *Id.* at *19-20. The court determined that PEPRA was a permissible state law "backdrop" for collective bargaining because it did not substantially interfere with federal labor policy. *Id.* at *21-26. The court also determined the Department erred in failing to explain why the transit authority's ability to negotiate for other types of benefits did not make up for any change made by PEPRA. *Id.* at *27-28.

3

The district court also ruled that the Department had been arbitrary or capricious in concluding that there were not adequate arrangements in place to preserve the pension rights of MST employees hired before 2013 ( "classic employees").  2018 Decision, 306 F. Supp. 3d 1180.  The court reasoned that section 13(c)(1)'s obligation to preserve rights and benefits was intended "to prohibit only those changes that harm or diminish bargained-for rights" in a manner that is not trivial.  *Id.* at 1186-87.  The court determined that PEPRA's change to classic employees' airtime rights "was not sufficiently meaningful to trigger § 13(c)(1)."  *Id.* at 1189.  The court enjoined the Department from relying on PEPRA to deny California's application of funding for MST or SacRTD under section 13(c)(1) or (2).  *Id.* at 1190.  The Department initially appealed the court's decisions, but on November 5, 2018, moved voluntarily to dismiss the appeal.  On December 19, 2018, the Ninth Circuit denied ATU's motion to intervene and dismissed the appeal.

Pursuant to its Procedural Guidelines, 29 C.F.R. § 215, the Department refers grant applications and proposed protective arrangements and terms and conditions to:  the recipient and any subrecipient of the funding, and any unions representing employees of the recipient(s), its contractors, and/or other service area providers.  Following these guidelines, on November 16, 2018, the Department re-referred the grant applications at issue in the litigation on the basis of the previously certified protective arrangements.

Once a grant application is referred to the parties, the parties have fifteen days to inform the Department of any objection to the recommended terms.  For the Department to find an objection sufficient, it must "raise" material issues that "may require alternative employee protections," or "concern changes in legal or factual circumstances that may materially affect the rights or interests of employees."  29 C.F.R. § 215.3(d)(3).  If no party objects or the Department does not find the objection sufficient, the Department certifies the proposed terms.  The Department then provides FTA with a certification specifying the protective arrangements and terms and conditions to be made applicable to the federal assistance.  29 C.F.R. § 215.3(d)(5).  After reviewing the above listed objections, the Department concludes that no sufficient objections have been raised.

## Analysis

Analysis of sections 13(c)(1) and (2)

After the district court's decisions, the Department independently reexamined the scope of its authority under section 13(c) and the best way to provide fair and equitable employee protective arrangements.  The Department now concludes that Section 13(c) grants the Secretary broad discretion in determining whether there are adequate "employee protective arrangements." 49 U.S.C. § 5333(b).  The protective arrangements required as a condition of financial assistance are those that "the Secretary concludes are fair and equitable."  *Id.* (emphasis added).  The plain terms of the statute make clear the deference to be afforded to the Secretary's judgment of what provisions are fair between an employer and employees.  *See Kendler v. Wirtz*, 388 F.2d 381, 384 (3d Cir. 1968) ("It is for the reasonable accommodation of unavoidably conflicting interests . . . that the Congress has seen fit to make the judgment of the Secretary of Labor as to what is fair and equitable controlling."); *cf. City of Los Angeles v. U.S. Dep't of Commerce*, 307 F.3d 859,

4

870-71 (9th Cir. 2002) (holding that statute providing that the Secretary of Commerce "shall, if he considers it feasible," use statistical sampling, vests "meaningful discretion" on the Secretary to set a standard for feasibility and to determine whether the standard has been met); *Connecticut Dep't of Children & Youth Servs. v. Department of Health & Human Servs.*, 9 F.3d 981, 985-86 (D.C. Cir. 1993) (statute requiring that specified procedures and programs must be implemented to the "satisfaction of the Secretary" constituted an "extraordinary grant of discretion" to the Secretary, subject to reversal only for an "egregious claim"); *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1224-25 (D.C. Cir. 1993) (statute empowering Secretary to provide "such other exceptions and adjustments * * * as the Secretary deems appropriate" grants "broad delegation of discretion" subject to "quite narrow" judicial review).

The statutes provides that the Secretary must conclude that each of the five[1] different varieties of protective provisions that must be included among the § 13(c) arrangements are fair and equitable. But the Secretary still retains broad discretion in evaluating fairness and equity vis-à-vis each of the five objectives. *Kendler v. Wirtz*, 388 F.2d 381, 383 (3d Cir. 1968). Section 13(c) directs that the "[a]rrangements . . . shall include provisions that <u>may be necessary</u>" to meet these five objectives. 49 U.S.C. § 5333(b)(2) (emphasis added). The use of the permissive term "<u>may be necessary</u>" underscores the breadth of the Secretary's discretion under section 13(c) to determine what provisions are needed to satisfy the five requirements. *See Amalgamated Transit Union Int'l, AFL-CIO v. Donovan*, 767 F.2d 939, 944 n.7 (D.C. Cir. 1985) (differentiating requirement that the Secretary determine all five objectives are satisfied prior to certification from Secretary's discretion to determine "whether or not a specific provision within a labor agreement satisfies one of section 13(c)'s express objectives").

In this case, the Secretary must determine whether arrangements satisfy section 13(c)'s objectives of "preservation of . . . benefits . . . under existing collective bargaining agreements" and "continuation of collective bargaining rights." 49 U.S.C. § 5333(b)(2)(A)&(B). As the district court correctly recognized, the terms "continuation" and "preservation" could be construed strictly to mean that no changes can be made to employees' collective bargaining rights, or more leniently to mean that the rights must only be substantially continued or preserved. *See* 2016 Decision, 2016 WL 4441221, at *10-12; *see also Random House Webster's Unabridged Dictionary* 440 (2d ed. 2001) ("continuation" means "something that continues some preceding thing by being of the same kind or having a similar content"). The statutory text permits either interpretation.

Although courts and the Department have looked to the legislative history of section 13(c), that history does not fully resolve the ambiguity in the meaning of "continuation" and "preservation." As the Department explained in its earlier determinations, Senator Wayne Morse, section 13(c)'s sponsor, indicated that the provision was designed to avoid a "lessening" or "worsening" of rights, suggesting Congress could have been concerned about any diminishment of rights. *See* 109 Cong. Rec. 5671-72 (1963). Senator Morse's reference to "lessening" or "worsening" may be considered in context as opposition to a committee bill's mere encouragement of the continuation of collective bargaining rights, however. In that context, he could have been using

---

[1] As previously codified, section 13(c) enumerated five subsections. *See* 49 U.S.C. § 1609(c) (1988). In 1994, the text of the statute as codified was revised to separate the fourth assurance into two separate lettered paragraphs, which is how it remains today. *See* 49 U.S.C. § 5333(b)(2)(d) and (e) (1994).

the terms at a high level of generality to oppose the "lessening" or "worsening" that would result if states were only encouraged to continue collective bargaining rights, *i.e.*, a system in which collective bargaining rights would not be entirely eliminated but preserved only partially and to varying degrees in different states. The legislative history does not show that legislators had a settled conception that any lessening in rights in a particular collective bargaining relationship, no matter how minor, would necessarily fail to preserve rights under an existing collective bargaining agreement or discontinue the right to bargain collectively.

The purpose and context of the statute, however, do suggest that an appropriate interpretation is that the statute does not preclude certification in all circumstances where there may be diminishments in collective bargaining rights and benefits. Section 13(c)'s purpose was to allow the Secretary to accommodate states' unique circumstances while ensuring fairness and equity and the "legislative history stress[es] the need for flexibility and discretion." *Local Div. 589, Amalgamated Transit Union, AFL-CIO, CLC v. Mass.*, 666 F.2d 618, 634 (1st Cir. 1981). It would be contrary to this flexible design to conclude that any change in state law over the years that affects bargaining rights or benefits of its public sector employees means the Secretary would lose any discretion in determining whether the requirements of the statute are met.

It is also revealing that section 13(c)'s purpose was not to "subject local government employers to the precise strictures of the NLRA." *Donovan*, 767 F.2d at 949; *see also Jackson*, 457 U.S. at 28 ("Congress designed § 13(c) . . . to accommodate state law to collective bargaining, not as a means to substitute a federal law of collective bargaining for state labor law."). During debate, Senator Morse assured Senator Goldwater that section 13(c) did not disturb the NLRA's exemption of state and local governments from its requirements. *See* 109 Cong. Rec. 5674 (1963). Senator Morse also clarified that workers would not retain the right to strike after becoming employed by a state that forbade strikes by public employees. *See id.* at 5672. Despite the loss of this economic weapon, Congress did not explicitly require workers be given some other right to compensate for the loss. *See Donovan*, 767 F.2d at 953-55. In fact, the *Donovan* court suggested that it may be proper under 13(c) to allow wage disputes, which are universally acknowledged to lie at the heart of collective bargaining, *id.* at 950-51, to be resolved through "good faith" collective bargaining supported, if necessary, by non-binding mandatory, meaningful fact-finding. This indicates that Congress did not intend that the Department apply with rigidity the requirements of the NLRA when interpreting section 13(c) requirements and recognized that the transition from private workers protected by the NLRA to public employees exempt from it would necessarily entail a loss of some collective bargaining rights, including the right to bargain over a no-strike clause. Consequently, it is reasonable not to apply with rigidity to section 13(c) arrangements the rule that private employers may violate the NLRA by making "[e]ven minimal unilateral changes to terms and conditions of employment." *See* 2016 Decision, 2016 WL 4441221, at *19. Rather, section 13(c)'s purpose and context suggest that not all changes to bargaining rights and benefits accomplished through state law preclude certification.

This more lenient interpretation of the meaning of "continuation" and "preservation" provisions in section 13(c) is not inconsistent with the relevant case law. It follows the California district court's decisions. *See* 2018 Decision, 306 F. Supp. 3d at 1187 (explaining section 13(c) protects affected employees against "meaningful negative changes to rights and benefits conferred by their then-existing collective-bargaining agreements"). It also does not conflict with the D.C.

Circuit's opinion in *Donovan*. The D.C. Circuit explained Senator Morse's reference to "[m]aintaining the status quo" as usually meaning "*substantially* preserving collective bargaining rights that had been established by federal labor policy." *Donovan*, 767 F.2d at 948 (emphasis added). The D.C. Circuit therefore recognized that section 13(c) did not require the absolute preservation of all collective bargaining rights.

This interpretation is also consistent with case law recognizing that the Department's role is to ensure the arrangements are fair and equitable as opposed to ensuring the perpetuity of certain benefits or rights. Under section 13(c), the Department must certify as of the time of a pending grant application that the "protective arrangements" are "fair and equitable" under the five objectives, and, if the state were to change its law "'contrary to the policy of 13(c)'" and "'halt the flow of funds or take other appropriate action.'" *Donovan*, 767 F.2d at 948 n.9 (quoting *Local Div. 589*, 666 F.2d at 634). Only a change that is "basically unfair or inequitable" would be problematic since "Congress's general intent to secure fair arrangements does not require the implementation of any *particular* set of detailed provisions." *Local Div. 589*, 666 F.2d at 634 (emphasis added). These courts recognized that Congress granted the Department discretion to determine whether the agreement is fair and equitable, but section 13(c) does not require the Department to go beyond that role.

Application of section 13(c) in this case

The discussion above shows that section 13(c) does not compel the results the Department reached in 2013 and 2015. Instead, it shows that key statutory terms can be interpreted in different ways and that the Secretary has broad discretion to determine which fair and equitable arrangements may be necessary for "preservation of . . . benefits . . . under existing collective bargaining agreements" and "continuation of collective bargaining rights." 49 U.S.C. § 5333(b)(2)(A)&(B). As explained below, there are several reasons why the Department now determines that such arrangements exist despite PEPRA's impact on affected employees.

While PEPRA does make significant reforms to California's public employee pension system, the reforms do not substantially affect transit employees' benefits under existing collective bargaining agreements. PEPRA addresses only one substantive term of employment (pensions). PEPRA imposes few, if any, restrictions on other subjects of collective bargaining. Moreover, PEPRA does not preclude bargaining over pensions altogether, but rather caps defined benefit plans and their eligibility criteria prospectively while allowing bargaining over defined contribution plans. As attorneys representing California noted, "PEPRA does not stand as an obstacle to substantive bargaining over participation in, and contributions to, defined contribution qualified retirement plans such as a 401(k) or 457(b) plan, or other forms of deferred compensation as the parties may bargain." AR 001323. "In fact, nothing in PEPRA prohibits the negotiation of an actuarially equivalent retirement benefit to that which may have been allowable through a defined benefit pension prior to PEPRA." *Id.* Additionally, since some of PEPRA's changes to defined benefit plans only go into effect after the expiration of a collective bargaining agreement in effect on January 1, 2013, *see* Cal. Gov. Code § 7522.30(f), the law allowed time and opportunity for such negotiations. Therefore, the Department concludes that, despite PEPRA, the section 13(c) arrangements meet section 13(c)(2)'s standard

of "preservation of . . . benefits . . . under existing collective bargaining agreements."  49 U.S.C. § 5333(b)(2)(A).

PEPRA also does not impermissibly impair collective bargaining rights in violation of section 13(c)(2)'s standard of "continuation of collective bargaining rights."  PEPRA does not interfere with the collective bargaining process.  It leaves agencies and employees "free to negotiate around [PEPRA's] effects and within [its] restrictions."  *See* 2016 Decision, 2016 WL 4441221, at *25.  In fact, as the court noted, transit agencies and employees "have continued collective bargaining over other complementary pension strategies in the wake of PEPRA's enactment." *Id.* Such a determination is consistent with Congress' implicit acknowledgement that collective bargaining rights remain even if state law takes away an employee right without replacing it with an equivalent benefit.  *See Donovan*, 767 F.2d at 953-55 (explaining that Congress recognized transition from private to public would result in the loss of the right to strike, but did not necessarily require employees be provided with some equivalent economic weapon).

Moreover, the Department concludes that the section 13(c) arrangements are "fair and equitable" despite PEPRA's requirements.  As the court noted, even the NLRA "allows private employers to follow the dictates of economic necessity, so long as they bargain over the effects of management's decisions."  2016 Decision, 2016 WL 4441221, at *25.  Section 13(c) therefore allows California some latitude to address a problem of economic necessity concerning its budget, especially given that the legislative history indicates that Congress did not intend the provision to result in a strict application of NLRA precedent and intended more flexible dealings with states.  *See id.* at *24; *see also Local Div. 589*, 666 F.2d at 639 (explaining "[t]he state's 'paramount authority . . . extends to economic needs as well,'" and "the importance of allowing states to legislate freely on social and economic matters of importance to their citizens, modifying the law to meet changing needs and conditions" (quoting *Veix v. Sixth Ward Ass'n*, 310 U.S. 32, 39 (1940)).

In this instance, PEPRA was not aimed at undermining this collective bargaining system but at alleviating the state's serious financial problem of pension funding.  The Department considers both PEPRA's unique purpose and its limited effect in deciding to certify the grants at issue. Since PEPRA's effect is limited to one area of collective bargaining, and that area remains open for bargaining over significant aspects of pensions, PEPRA does not prevent the parties from meeting their statutory minimum and the employee protective arrangements appear fair and equitable.  Thus, the Department determines that PEPRA does not preclude certification of the grants at issue.

The Department recognizes the ATU's desire to defend the Department's 2013 and 2015 determinations not to certify the grants at issue based on PEPRA.  The Department does not consider that position a sufficient reason to deny certification. Since the 2013 and 2015 determinations, the Department has changed its position in a number of ways.  First, as the district court concluded, the Department previously improperly treated *Donovan* as controlling even though the law at issue in *Donovan* was materially different from PEPRA.  The law in *Donovan* applied to one transit authority, was aimed at collective bargaining, and removed five subjects from the collective bargaining process.  *Donovan*, 767 F.2d at 942-43.  In contrast, PEPRA is a state-wide law applicable to public employees generally and is not directed to the

process of collective bargaining but rather addresses the substantive terms of employment in one respect (pensions), an area where states traditionally have latitude, and, as discussed above, it does not preclude bargaining over pensions altogether.  In light of the district court's decision, and on reexamination of *Donovan*, the Department concludes that its earlier determinations should not have treated *Donovan* as controlling.

Second, the Department's earlier determinations gave insufficient consideration to terms in section 13(c), discussed above, that give discretion to the Department to interpret section 13(c)'s requirements.  Third, the earlier determinations adopted definitions of statutory terms such as "continuation" and "preservation" that were not compelled by the statutory language or legislative history.  As explained above and in the district court's decisions, section 13(c) grants the Secretary broad discretion to determine whether arrangements continue bargaining rights and preserve benefits even if a state law has made certain changes impacting collective bargaining rights and benefits of transit employees.  *See* 2016 Decision, 2016 WL 4441221, at *20; 2018 Decision, 306 F. Supp. 3d at 1187.  Fourth, the 2015 determination focused on NLRA precedents concerning the duty to bargain and preemption without sufficient consideration of UMTA's purpose and context, which indicate that the Department should not apply section 13(c) in a manner that reflexively incorporates NLRA precedent to a public sector setting.

Finally, the Department's earlier determinations gave too little weight to what the district court termed the realities of public sector collective bargaining.  The district court's decisions and the statutory purpose and context of section 13(c) indicate that Congress intended the Department to exercise flexibility when accommodating state's public sector collective bargaining.  The provisional purpose of Congress in enacting section 13(c) – to cushion the impact on transit employees of a change from private to public sector employment – is relevant in interpreting the scope of section 13(c)'s protections.  The Department considered that purpose in more carefully examining the changes made by PEPRA to determine if there is still a sufficient continuation of rights and preservation of benefits.  The Department determines that PEPRA's effects are sufficiently limited in scope and purpose so as to allow the Department to conclude the arrangements continue to exist that meet section 13(c)'s requirements for the continuation of collective bargaining rights and the preservation of rights, including continuation of pension rights and benefits under existing collective bargaining agreements.

Sincerely,

Arthur F. Rosenfeld, Director
Office of Labor-Management Standards

cc:  See certifications

**U.S. Department of Labor**     Office of Labor-Management Standards
Washington, D.C. 20210



October 28, 2021

Ray Tellis, Regional Administrator
Federal Transit Administration, Region IX
201 Mission Street, Suite 2210
San Francisco, California 94105

Re:     Reconsideration of June 14, 2019 Determination Responding to Objections to
        Employee Protection Terms for Pending FTA Grant Applications
        Alameda-Contra Costa Transit District, CA-2017-017-01 and CA-2019-011;
        Golden Gate Bridge, Highway and Transportation District, CA-2019-041;
        Los Angeles County Metropolitan Transportation Authority, CA-2018-012-01 and CA-
        2018-093-01;
        Riverside Transit Agency, CA-2019-048;
        San Francisco Bay Area Rapid Transit District, CA-2019-029;
        San Joaquin Regional Transit District, CA-2019-034;
        San Mateo County Transit District, CA-2017-104-01;
        Santa Clara Valley Transportation Authority, CA-2018-081-01 and CA-2019-047

Dear Mr. Tellis:

Before state and local transportation agencies can receive certain federal mass transit funding
assistance, Section 13(c) of the Urban Mass Transportation Act of 1964 ("UMTA") requires that
the U.S. Secretary of Labor certify that "fair and equitable" arrangements are in place to protect
the interests of affected employees. 49 U.S.C. § 5333. Those arrangements "shall include
provisions that may be necessary for" "the preservation of rights, privileges, and benefits
(including continuation of pension rights and benefits) under existing collective bargaining
agreements or otherwise" and "the continuation of collective bargaining rights." *Id.* §
5333(b)(2)(A), (B) (commonly referred to as Section 13(c)(1) and (c)(2)).

In 2013, the Department[1] determined that the enactment of the California Public Employees'
Pension Reform Act of 2013 ("PEPRA"), Cal. Gov't § 7522 *et seq.*, precluded Section 13(c)
certification of grants to two California transit agencies. The transit agencies had received federal
transit funding for decades and committed to abide by Section 13(c)'s requirements.
Nevertheless, the transit agencies unilaterally reduced their employees' pension benefits in order
to comply with the substantial restrictions imposed by PEPRA on public employers in California.

---

[1] The Secretary of Labor delegated his authority under Section 13(c) to the Office of Labor-Management Standards
(OLMS). *See* Secretary's Order 8-2009, § 5.A(4), 74 Fed. Reg. 58835 (Nov. 13, 2009). For simplicity, this
reconsideration uses the term "the Department" generally to refer to those at the U.S. Department of Labor given
authority for Section 13(c) certification.

1

The Department reasoned that PEPRA substantially diminished the affected unions' ability to bargain over future pension benefits in violation of Section 13(c)(2)'s requirement to continue collective bargaining rights and reduced benefits provided under the agreements for employees in contravention of Section 13(c)(1)'s preservation of existing benefits requirement. California and the transit agencies successfully challenged the Department's position in the U.S. District Court for the Eastern District of California and ultimately obtained an injunction that precluded the Department from relying on PEPRA to withhold certification of the grant funds intended to benefit those two transit agencies.

On June 14, 2019, the Department issued a determination ("2019 Determination") reevaluating its prior determinations and acquiescing to the district court's conclusions that PEPRA's impact on transit employees did not preclude Section 13(c) certification. In light of litigation brought by transit employees' unions regarding the 2019 Determination, the Department, after further deliberation, believes that the 2019 Determination does not reflect the best approach to certification under Section 13(c). Upon reconsideration, the Department has decided that it does not agree with the substance of the 2019 Determination, which represents a deviation in the Department's long-standing interpretation and application of Section 13(c).

The Department hereby nullifies that 2019 deviation and returns to its original superior position. The Department finds that PEPRA effectively precludes certification under Section 13(c) for those transit agencies subject to its reforms. The reasons for the Department's return to its longstanding position are set forth at length below. The Department, however, is not rescinding or otherwise taking retrospective action as to the particular grant certifications addressed in the 2019 Determination. The Department's certifications pursuant to its 2019 Determination included no conditions indicating that funds could be de-obligated or that transit agencies might incur other obligations in the event of a change in the Department's application of Section 13(c). Therefore, the Department does not believe it would be fair and equitable, in light of all the circumstances, to issue a decision that could de-obligate the funds that have been obligated as a result of these particular grant certifications. The Department's conclusion to this effect accounts for any reliance interests that the State of California and its transit agencies may have in the 2019 Determination; the State's interests in the funds already committed are protected, and the State is now apprised of the approach that the Department will take with respect to Section 13(c) for grant applications prospectively.[2]

### Background and Procedural History

### The California Public Employees' Pension Reform Act (PEPRA)

California enacted PEPRA in 2012 to reform the state's public employee pension system. PEPRA affects the vast majority of California transit system employees because most participate in affected public retirement systems, such as the California Public Employees' Retirement System ("CalPERS"), a retirement system established under the County Employees Retirement

---

[2] While the Department will change its approach going forward, it will of course continue to comply with the injunction entered by the Court in the prior case. *See California v. U.S. Dep't of Labor*, 306 F. Supp. 3d 1180, 1190 (E.D. Cal. 2018) (granting injunctive relief but limiting scope of injunction to the two transit agencies at issue in that case).

Law of 1937 ("1937 Act System"), or an independent public retirement system plan. *See* Cal. Gov't § 7522.02(a)(1); AR[3] 64-001325 n.1.[4] PEPRA's most significant revisions are for those hired on or after January 1, 2013 ("new employees"), but certain provisions also affect those hired before that date ("classic employees").

PEPRA makes significant reductions to the maximum pension benefits that can be offered by public agencies participating in affected California retirement systems. Among other changes, PEPRA lays the groundwork for increased cost-sharing of defined benefit pensions. PEPRA requires that employees hired on or after January 1, 2013 pay at least 50% of the normal costs of any defined benefit pension plan and prohibits employers from paying any of the statutory employee contribution. Cal. Gov't § 7522.30(c). PEPRA extends that goal to all employees, declaring that "[t]he standard shall be that employees pay at least 50 percent of normal costs." *Id.* § 7522.30(a); *see also id.* § 20516.5(a). As of January 1, 2018, PEPRA also allows employers that contract with CalPERS to require all employees pay 50 percent of the normal costs, although for employees represented by labor unions, the employer can unilaterally impose this requirement only after bargaining to impasse. *Id.* § 20516.5(b) & (c).

PEPRA also makes changes to pension formulas and how benefits are calculated. PEPRA establishes minimum retirement ages and length-of-service requirements, and sets the maximum percentage of compensation to which a retiree will be entitled. *Id.* §§ 7522.20, 7522.25. PEPRA defines the final compensation that will be used to calculate pension benefits, providing for a three-year period for compensable income calculations, excluding certain income such as bonus payments and overtime pay, and capping the total amount of eligible income. *Id.* §§ 7522.10, 7522.32, 7522.34, 7522.42. It phased out the ability of public employees to purchase nonqualified service time (service credit for non-working time) or "airtime." *Id.* § 7522.46. It requires that enhancements to a public employee's retirement formula or benefit can only apply prospectively. *Id.* § 7522.44(a)-(b). PEPRA limits the ability of public employee retirees to work and simultaneously collect a pension. *Id.* § 7522.56.

PEPRA also places limits on the types of plans that public agencies can offer. It bars a public employer from offering a defined benefit pension plan to new employees that would cost more or be riskier to the employer than statutory benefit formulas. *Id.* § 7522.15. PEPRA bars a public employer that did not offer a supplemental defined benefit plan before January 1, 2013, from doing so after that date or from including any new employee in an existing supplemental defined benefit plan. *Id.* § 7522.18(a), (c).

---

[3] AR refers to the Administrative Record compiled for the challenge to the Department's 2019 Determination. *See* Certified List of the Contents of the Administrative Record, ECF# 15, filed in *ATU v. U.S. Dep't of Labor*, No. 2:20-CV-00953-KJM-DB, 2021 WL 2003104 (E.D. Cal. May 19, 2021).

[4] Transit agencies in California may choose between various options for retirement systems for their employees. Many transit agencies in California choose to contract with CalPERS or the 1937 Act systems, and by doing so, they are subject to the limitations mandated by PEPRA for those systems. Other transit agencies participate in pension trusts governed by the Employee Retirement Income Security Act of 1974 or have established their own locally administered retirement system. *See* AR 64-001325 n.1. Some transit systems in California use private contractors for the operation of all service and vehicle maintenance and so are not affected by PEPRA's restrictions on public employers and employees.

**Prior Related Administrative and Court Proceedings**

2013 and 2015 Determinations and Related Litigation

Related prior administrative proceedings began in 2012 when two public transit agencies, the Sacramento Regional Transit District ("SacRTD") and the California Department of Transportation ("Caltrans") on behalf of Monterey-Salinas Public Transit System Joint Powers Agency d/b/a Monterey-Salinas Transit ("MST"), submitted grants for Section 13(c) certification. *See California v. U.S. Dep't of Labor ("Cal. II")*, 2016 WL 4441221, at *4 (E.D. Cal. 2016). The Amalgamated Transit Union (ATU), whose locals represented affected transit workers, filed objections to certification due to PEPRA's effects on transit workers collective bargaining rights. The Department denied certification of SacRTD's grant application on September 4, 2013 and of MST's application on September 30, 2013, finding, *inter alia*, that PEPRA prevented "continuation of collective bargaining rights" under Section 13(c)(2) and thus precluded certification. *See* AR 5-000126; AR 6-000144; AR 14-000196 ("2013 Determinations").

California and the transit agencies sought review of the 2013 Determinations in the U.S. District Court for the Eastern District of California. In a 2014 decision, the court held that the 2013 Determinations were arbitrary and capricious. *California v. U.S. Dep't of Labor ("Cal. I")*, 76 F. Supp. 3d 1125 (E.D. Cal. 2014). Among the reasons the court provided was that the Department erred in "reflexively" relying on *Amalgamated Transit Union, AFL-CIO v. Donovan*, 767 F.2d 939 (D.C. Cir. 1985), in light of the factual differences between that case and the circumstances presented by PEPRA, which involved "a state's system-wide changes in some aspects of public employment." 76 F. Supp. 3d at 1143. Additionally, the court found that the Department's conclusion that PEPRA prevented collective bargaining over pensions was erroneously premised on an assumption that a pension must necessarily be a defined benefit rather than a defined contribution plan. *Id.* The court further stated that the Department was arbitrary and capricious in, *inter alia*, "fail[ing] to consider the realities of public sector bargaining," and in determining that not yet hired employees had rights under collective bargaining agreements. *Id.* at 1144-45. The court remanded the matter to the Department for further proceedings consistent with its decision. *Id.* at 1148.

On August 13, 2015, the Department reaffirmed its denial of the Section 13(c) certifications, providing additional explanation to address the issues raised by the court. *See* AR 94-001645; AR 99-001677 ("2015 Determinations"). California and the transit agencies returned to court to challenge the new determinations, and the court once again ruled that they were arbitrary and capricious. *California v. U.S. Dep't of Labor ("Cal. III")*, 306 F. Supp. 3d 1180, 1190 (E.D. Cal. 2018); *Cal. II*, 2016 WL 4441221. The court found that the statutory text and legislative history of Section 13(c) were ambiguous as to whether Section 13(c)(2)'s provision requiring "the continuation of collective bargaining rights" protected those rights from a diminishing or lessening that fell short of elimination. *Cal. II*, 2016 WL 4441221, at *9-12, 15-17. The court noted, however, that the history of the statute suggested that the provision was "motivated primarily by larger-scale restrictions on collective bargaining rights" not present in this case. *Id.* at *17.

4

The court also determined that the Department erred in relying on case law establishing that even minimal unilateral changes by an employer could violate the statute because Congress' intent was not to apply all National Labor Relations Act (NLRA) law to states through the UMTA. *Id.* at \*19-20. The court determined that PEPRA was a permissible state law "backdrop" for collective bargaining because it did not substantially interfere with federal labor policy. *Id.* at \*21-26. In making this determination, the court analyzed whether a private analog of PEPRA would be subject to preemption under the NLRA. *Id.* The court created a test with the following five factors to evaluate this preemption issue: (1) Does the state law concern state interests deeply rooted in local feeling and responsibility and are those interests a merely peripheral concern of federal policy?; (2) Is the state law one of general applicability?; (3) Does the law protect workers' interests, for example, by establishing minimum labor standards?; (4) Does the state law essentially dictate the substantive result of collective bargaining?; (5) Does the law otherwise clash with the federal goal of encouraging the employer and the representative of the employees to establish, through collective negotiation, their own charter for the ordering of industrial relations? The court's application of this test resulted in one factor favoring the Department (the fifth), one factor favoring the transit agencies (the fourth), and the remaining three factors being neutral or uncertain. Within the context of this test and also as an independent basis, the court found the Department erred in failing to explain why the transit authority's ability to negotiate for other types of benefits did not make up for any change made by PEPRA. *Id.* at \*25, 27-28.

The court also ruled that the Department had been arbitrary or capricious in concluding that there were not adequate arrangements in place to preserve the pension rights of classic employees given the less significant changes to these employees' benefits. *See Cal. III*, 306 F. Supp. 3d 1180. The court enjoined the Department from relying on PEPRA to deny California's application of funding for MST or SacRTD under Section 13(c)(1) or (2). *Id.* at 1190. The Department appealed the court's decisions, but, on November 5, 2018, moved voluntarily to dismiss the appeal. *See* AR 162-002563. On December 19, 2018, the Ninth Circuit denied ATU's motion to intervene and dismissed the appeal. *See id.*

<u>June 14, 2019 Determination and Related Litigation</u>

On November 16, 2018, the Department re-referred the SacRTD and MST grant applications to ATU and the recipients. Between January and May 2019, the Department also referred eleven other grant applications by California transit agencies. *See* AR 163-002569 (2019 Determination). ATU objected to the proposed certifications of the SacRTD and MST grants on the basis that it would be premature and improper to certify the grant to comply with the district court's decision given that an appeal was still pending.[5] *See id.* at 1-2. ATU objected to the other proposed certifications due to PEPRA's effect on transit employees' collective bargaining rights. *See id.* at 2.

On June 14, 2019, the Department issued the 2019 Determination responding to ATU's objections to certification of multiple California grants due to PEPRA's effect on transit employees' collective bargaining rights. The 2019 Determination explained that the Department had "reexamined" its earlier position, and "[i]n light of the [California] district court's

---

[5] At that time, ATU's motion to intervene was still pending.

decisions," had "concluded that PEPRA does not present a bar to certification under section 13(c)." *Id.* at 2. The 2019 Determination first explained that it had reexamined the scope of its certification authority under Section 13(c) and determined that the provision grants the Secretary "broad discretion" to determine the adequacy of protective arrangements under Section 13(c). *Id.* at 4-5.

The Department further acknowledged that while the statute requires the Secretary to assess whether each of the enumerated statutory objectives has been satisfied, "the Secretary still retains broad discretion in evaluating fairness and equity vis-à-vis each of the five objectives." *Id.* at 5. Turning specifically to the provisions for the preservation of benefits and continuation of collective bargaining rights, the Department found that they could be read "strictly to mean no changes can be made to employees' rights, or more leniently to mean that rights must only be substantially continued or preserved." *Id.* at 5-6. The 2019 Determination noted that the purpose and context of the statute suggest, however, that the more lenient interpretation is appropriate. *Id.* at 6-7. The Department explained that Section 13(c) was designed to give the Secretary the flexibility to consider states' unique circumstances and not rigidly incorporate the strictures of the NLRA that preclude an employer from making even minimal unilateral changes to terms and conditions of employment. *Id.*

The 2019 Determination applied this interpretation to the grants at issue, finding that PEPRA did not substantially affect transit employees' benefits under existing collective bargaining agreements or impermissibly impair collective bargaining rights in violation of Section 13(c). *Id.* at 7-9. The Department explained that PEPRA only impacts bargaining over one substantive term of employment, pensions, and does not foreclose bargaining altogether but leaves employees free to negotiate around its restrictions. *Id.* at 7-8. It further explained that PEPRA was not aimed at the collective bargaining process but at alleviating the state of California's "serious financial problem of pension funding." *Id.* at 8. In light of PEPRA's unique purpose and limited effect, the Department concluded that it did not preclude certification of the grants at issue. *Id.*

On August 22, 2019, ATU and some of its affiliated California local unions filed suit against the Department in the U.S. District Court for the District of Columbia, challenging the Department's certification of grants to the California transit agencies in the 2019 Determination. California filed a motion to intervene along with a proposed motion to transfer venue to the U.S. District Court for the Eastern District of California, which were granted by the U.S. District Court for the District of Columbia on December 19, 2019 and April 29, 2020, respectively. *See ATU v. U.S. Dep't of Labor*, No. 2:20-CV-00953-KJM-DB, 2021 WL 2003104 (E.D. Cal. May 19, 2021). ATU moved for summary judgment, and the Department and California separately filed oppositions and cross-motions for summary judgment.

Prior to the filing of the Department's reply, there was a change in administration that resulted in new leadership assuming responsibility for the Department. The Department sought and received stays from the court so that new leadership would have time to become familiar with the issues in this case and decide whether to reconsider the Department's position regarding PEPRA. The Department now issues this reconsideration of its 2019 Determination.

## Analysis

**Understanding Collective Bargaining**

PEPRA substantially interferes with the scope of permissible collective bargaining by transit workers and transit agencies such that Section 13(c)(2)'s requirement regarding "the continuation of collective bargaining rights" is not met. PEPRA places limits on the maximum pension benefits obtainable by transit workers, making defined benefit plan terms less favorable and shifting investment risk from employer to employee. As noted above, PEPRA established a minimum contribution amount for new employees, set the formula for time-in-service requirements, capped pensionable compensation, excluded certain compensation from pensionable compensation, and placed limitations on supplemental defined benefit plans. After PEPRA, unions and the transit agencies can no longer bargain freely about the calculation of defined benefit pensions, the service requirements for qualification, the compensation to be used for calculating pension amounts, the percentage of costs to be paid by new employees, or the addition of a new defined benefit plan. In essence, PEPRA largely removed the subject of defined benefit pensions from collective bargaining.

In doing so, PEPRA significantly interferes with transit employees' ability to bargain over pension rights, which is a mandatory subject of collective bargaining. *See Allied Chem. & Alkali Workers of Am., Local Union No. 1 v. Pittsburgh Plate Glass Co., Chem. Div.*, 404 U.S. 157, 159 (1971) ("Under the National Labor Relations Act, as amended, mandatory subjects of collective bargaining include pension and insurance benefits for active employees."); *S. Nuclear Operating Co. v. NLRB*, 524 F.3d 1350, 1356 (D.C. Cir. 2008) (explaining that the Supreme Court has "made clear that retirement benefits for current employees are mandatory bargaining subjects"). While PEPRA does not restrict collective bargaining procedures themselves, it predetermines significant aspects about the outcome of any such procedures with respect to defined benefit pensions. The state law places new limits on the potential solutions that transit agencies and transit workers can reach to the question of appropriate wages and benefits. In the Department's assessment, this constitutes a significant interference with transit workers' collective bargaining rights such that they are not "continued" within the meaning of Section 13(c) and the Department cannot certify that fair and equitable arrangements are in place to protect transit workers affected by assistance in California.

California and its transit agencies have received federal transit funding for decades and committed to abide by Section 13(c)'s requirement that changes to transit employees' wages and benefits be brought about by collective bargaining rather than state fiat. PEPRA violated this agreement, mandating that transit agencies make changes to workers' benefits and resulting in collective bargaining agreements that are consistent with the new limits. California and the transit agencies have not remedied the violation and continue to allow PEPRA to impede transit workers' collective bargaining rights with its significant limits on obtainable defined benefit pension plans. In limiting potential solutions that employers and employees can reach regarding the question of deferred compensation, PEPRA continues to interfere with the collective

bargaining process regardless of the specific terms of workers' collective bargaining agreements now in existence.[6]

The Department remains convinced of the accuracy of this assessment of PEPRA's impact after reviewing the 2019 Determination and the district court decisions finding the 2013 and 2015 Determinations to be in violation of the Administrative Procedure Act. For the reasons explained below, the Department disagrees with the exercise of discretion under Section 13(c) reflected in the 2019 Determination, notwithstanding the arguments made in those decisions that Section 13(c) certification is appropriate despite PEPRA. First, the Department does not agree that PEPRA's changes are so insignificant and unsubstantial that they do not impermissibly interfere with the continuation of collective bargaining rights for purposes of Section 13(c). Second, the Department does not believe that any of the complexities inherent in the interrelationship of public sector bargaining, state law, and federal labor law provide a justification for overlooking PEPRA's impact on transit workers' collective bargaining rights.

**PEPRA's Impact on Collective Bargaining Rights**

The 2019 Determination and district court decisions portray PEPRA's impact as insignificant and minimal by focusing on the ways in which collective bargaining rights were continued. The Department does not agree that PEPRA's substantial impact on pension benefits can be minimized by simply focusing on aspects of transit workers' collective bargaining rights that were untouched by the law.

First, the Department is not convinced that PEPRA's impacts are minor because they affect defined benefit plans but not defined contribution plans. *See* 2019 Determination at 7; *Cal. I*, 76 F. Supp. 3d at 1143. In order for a state or transit agency to significantly interfere with collective bargaining over pensions, it is not necessary that it affect bargaining about all types of pension plans. PEPRA's restrictions on defined benefit plans are sufficient alone, especially given the advantages such plans offer employees, including putting investment risk on the employer. *See* 2015 Determinations at 19-20.[7]

---

[6] PEPRA significantly interferes with collective bargaining rights for employees of affected public retirement systems, despite gradations in its effect. PEPRA's practical impact on transit employees depends on the particulars of each employee's situation, including the benefits enjoyed by the employee at PEPRA's enactment, the public retirement system that the transit agency participates in and the pension plan(s) it offers employees, and potentially the existence and contents of a collective bargaining agreement separately negotiated by a union to which the employee belongs.

[7] A defined benefit plan provides for a fixed periodic payment at retirement, which can be funded by contributions from the employer and employee. In a defined benefit plan, the employer is obligated to make up any shortfall in payouts to employees and so "typically bears the entire investment risk." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999); *Hurlic v. Southern California Gas Co.*, 539 F.3d 1024, 1029 (9th Cir. 2008). In contrast, defined contribution plans typically operate by having an employee contribute a fixed amount to their individual account, sometimes with employer contributions. At retirement, the employee is entitled to benefits based on the gains, losses, and expenses that investment of the contributions have incurred. *See Hughes Aircraft*, 525 U.S. at 439; *Hurlic*, 539 F.3d at 1029. Defined contribution plans shift the investment risk to the employee, and often require the employee to make decisions about contribution amounts, types of investment, and how to convert the funds to retirement income. *See, e.g.*, U.S. Government Accountability Office, Retirement Income, Ensuring Income Throughout Retirement Requires Difficult Choices, GAO-11-400 (June 7, 2011), *available at* http://www.gao.gov/products/GAO-11-400.

Second, the Department now finds untenable the 2019 Determination's conclusion that PEPRA's impact is diminished because it is not aimed at collective bargaining procedures themselves. *See* 2019 Determination at 8. Continuation of collective bargaining rights logically requires that an employer abide by the procedures in place and not be able to dictate terms and conditions of employment by fiat. An employer's unilateral change to terms and conditions of employment is a violation of the collective bargaining process and procedures. *See USC Univ. Hosp. & Nat'l Union of Healthcare Workers*, 358 NLRB 1205, 1213 (2012) ("It is, of course, long, well established Board and court authority that an employer violates Section 8(a)(5) and (1) of the [NLRA] if it makes a unilateral change in the wages, hours, working conditions, or other terms and conditions of employment of its employees without first giving a union representing a unit of employees notice and an opportunity to bargain." (*citing NLRB v. Katz*, 369 U.S. 736, 743 (1962))). As the D.C. Circuit observed in *Donovan*, "[c]ollective bargaining does not exist if an employer retains the power to establish wages, hours and other conditions of employment without the consent of the union or without at least first bargaining in good faith to impasse over disputed mandatory subjects." 767 F.2d at 951. In enacting PEPRA, the state unilaterally dictated certain substantive results of the collective bargaining process by preventing employees from obtaining certain favorable terms for defined benefit pension plans.[8] PEPRA's unilateral changes to obtainable pension benefits is inconsistent with the continuation of collective bargaining rights, just as changes to aspects of collective bargaining procedures may be as well.

Third, the Department finds unsupported the 2019 Determination's conclusion that PEPRA's effects are mitigated by the fact that employees and employers are free to bargain around PEPRA's effects and within its restrictions. *See* 2019 Determination at 8; *Cal. II*, 2016 WL 4441221, at *25, 28. In theory, employees may be able to coax an employer to offer certain benefits to mitigate the effect of PEPRA's restrictions. But this will always be true in any situation where the state or employer takes away rights or benefits but does not completely eliminate collective bargaining. The logical result of this type of reasoning is that the employer will always be able to shape by state fiat the types of benefits obtainable in favor of employers and chip away at collective bargaining rights. For collective bargaining rights to continue, state employers cannot have authority to unilaterally diminish significant terms and conditions of employment of transit workers. As the D.C. Circuit in *Donovan* recognized, "the substantive provisions of collective bargaining agreements may change, but section 13(c) requires that the changes be brought about through collective bargaining, not by state fiat." 767 F.2d at 953.

Moreover, in practice, PEPRA places a hand on the scale in favor of the employer in a manner that is inconsistent with the process of collective bargaining. Under the rules of collective bargaining, an employer would need to negotiate with employees if it wished to place new restrictions on obtainable pension benefits and would likely need to offer some compensatory benefits to employees in exchange. In contrast, by enacting PEPRA, the state unilaterally

---

[8] As explained in the 2015 Determinations, pension plans are one of the terms and conditions of employment over which an employer must bargain collectively. Pensions were understood to be a mandatory subject of collective bargaining at the time of Section 13(c)'s passage. *See* 2015 Determinations at 11-12. Indeed, Section 13(c) itself specifically notes pensions rights among those protected. *See* 49 U.S.C. § 5333(b)(2)(A) (requiring "the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise").

removed certain outcomes from the process that were considered unfavorable to public employers in the state. PEPRA creates a result in favor of the employer without the prerequisite negotiations, which typically is what encourages employers to offer compensatory benefits to induce an agreement from employees. As such, the Department is not persuaded that PEPRA's effects can so easily be mitigated. It is not reasonable to base an assessment of whether collective bargaining rights have continued on speculation that some employees *may* have been able to obtain some compensatory benefits in exchange for restrictions mandated by state law. In the Department's judgment, PEPRA's restrictions constitute a significant interference with collective bargaining rights, regardless of the results of subsequent negotiations regarding pensions and other benefits.

Fourth, the Department does not view PEPRA's restrictions as less impactful because the most significant changes apply to recently hired employees. *See Cal. I*, 76 F. Supp. 3d at 1144-45. It is well established that new employees are entitled to the rights granted under collective bargaining agreements. *See* 2013 Determinations at 12-13; *see also J.I. Case Co. v. NLRB*, 321 U.S. 332, 334-36 (1944); *Gvozdenovic v. United Air Lines*, 933 F.2d 1100, 1106-07 (2d Cir. 1991). Employers may not unilaterally change wages and benefits of new employees. *See, e.g.*, *Mississippi Power Co.*, 332 NLRB 530, 532 n.10 (2000), *enfd. in relevant part*, 284 F.3d 605 (5th Cir. 2002); *Triple A Fire Prot., Inc.*, 315 NLRB 409, 422 (1994). The Ninth Circuit has specifically held that an employer violates federal labor law when it refuses to collectively bargain over new employees or refuses to apply the terms of existing agreements to the new employees. *NLRB v. Big Bear Supermarkets No. 3*, 640 F.2d 924, 931 (9th Cir. 1980). Given this basic principle of collective bargaining, it is appropriate to consider PEPRA's provisions affecting new employees when assessing the impact of the law on the continuation of collective bargaining rights. Additionally, Section 13(c)'s protections could soon become meaningless if the Department were to ignore employers' actions affecting the rights and benefits of recently hired or new employees, and there is "nothing in the text of the provision to suggest that the essential process entailed in 'the continuation of collective bargaining rights' should come to mean less as time goes by." *Donovan*, 767 F.2d at 957 (Ginsburg, J., concurring). As such, the Department is not persuaded by the district court decisions' and the 2019 Determination's assessment of PEPRA's effect on collective bargaining rights as trivial or unsubstantial.

**Interrelationship of Public Sector Bargaining, State Law, and Federal Law**

As explained below, upon further reflection, the Department finds the arguments in the 2019 Determination and district court decisions related to the dynamics involved in applying principles of federal labor law to state or local government to be unpersuasive. The Department looks to federal labor law in assessing these arguments about the intended relationship between Section 13(c) and state laws in order to understand the general scope of the duty to bargain collectively. As the D.C. Circuit recognized in *Donovan*, the Department now finds that the legislative history to the Urban Mass Transportation Act "reveals Congress' clear intent to measure state labor laws against the standards of collective bargaining established by federal labor policy." 767 F.2d at 948. Nevertheless, the Department uses NLRA precedent as guidance below and is not suggesting its rigid application to Section 13(c). *See* 2019 Determination at 6; *Cal. II*, 2016 WL 4441221, at *19.

Public Sector Realities

First, the Department does not find that the "realities of public sector bargaining" require the Department to excuse PEPRA's impact. *See Cal. II*, 2016 WL 4441221, at *21. The Department is familiar with the "realities of public sector bargaining" and that the process entails additional actors, considerations, and complications. Transit agencies need to consider "taxes, legislative policies, constitutional requirements, civil service principles, municipal codes, and other concerns in addition to the ordinary concerns of private employment, like budgets or competitors' practices." *See id*. Here, transit agencies were placed in an additional federal-state bind because California enacted a law that interfered with collective bargaining relationships that its transit agencies had agreed to preserve and continue as a condition of continued receipt of federal transit assistance.

As the 2019 Determination stated, Section 13(c) gives the Secretary of Labor a degree of flexibility and ability to adapt state and local circumstances to collective bargaining. *See* 2019 Determination at 6. But the Department does not view this flexibility as meaning that it is obligated to ignore or excuse all state or local government's unilateral changes to transit workers' rights because of "the many rocks and hard places between which [transit agencies] must navigate." *See Cal. II*, 2016 WL 4441221, at *21. Rather, Section 13(c) contemplates that the Department be allowed to conclude that a law impermissibly interferes with Section 13(c)'s protections, and "seek changes in state law and ultimately to refuse financial assistance when state law prevented compliance with § 13(c)." *See Jackson Transit Auth. v. Local Div. 1285, Amalgamated Transit Union, AFL-CIO-CLC*, 457 U.S. 15, 25 n.8 (1982); *see also Donovan*, 767 F.2d at 947 ("Section 13(c) does not prescribe mandatory labor standards for the states, but rather dictates the terms of federal mass transit assistance. States are free to forego such assistance and thus to adopt any collective bargaining scheme they desire . . . . But the statute does not allow states to eliminate collective bargaining rights and still enjoy federal aid."). In the Department's estimation, PEPRA's effects are significantly negative and cannot be disregarded simply because of the additional difficulties that public sector bargaining often entails.

Accommodation to Local Circumstances

Second, the Department does not conclude that PEPRA's impact should be overlooked as part of accommodating collective bargaining principles to California's and local agencies' unique circumstances. PEPRA was enacted to respond to the state's budgetary concerns. *See Cal. I*, 76 F. Supp. 3d at 1138 ("In 2012, California's Governor signed the PEPRA into law 'to reform California's public employee pension systems and to bring the staggering cost of funding such systems under fiscal control.'" (quoting California's First Amended Complaint)). The 2019 Determination granted undue latitude to California, drawing support from NLRA law that "'allows private employers to follow the dictates of economic necessity, so long as they bargain over the effects of management's decisions.'" 2019 Determination at 8 (quoting *Cal. II*, 2016 WL 4441221, at *25). But "effects bargaining" under the NLRA refers to decisions employers may make unilaterally because they are solely within the province of management, and does not apply to mandatory subjects of bargaining, like retirement benefits for current employees. *See First Nat'l Maint. Corp. v. NLRB*, 452 U.S. 666, 674-77 (1981).

11

Moreover, NLRA case law does not generally excuse unilateral actions regarding a mandatory subject of collective bargaining simply because "such action was compelled by economic need or that it may have served what may appear to us to be a desirable economic objective." *Oak Cliff-Golman Baking Co.*, 207 NLRB 1063, 1064 (1973), *enfd.*, 505 F.2d 1302 (5th Cir. 1974); *see also Air Convey Industries*, 292 NLRB 25, 26 (1988) (finding employer's financial inability to make the required benefit fund payments and that it has ceased operations to be no defense to a violation of the NLRA's requirement to abide by provisions of a collective bargaining agreement); *NLRB v. Manley Truck Line, Inc.*, 779 F.2d 1327, 1330-32 (7th Cir. 1985) (upholding NLRB's rejection of employer's argument for an economic necessity exception to the NLRA's prohibition against unilateral modifications of an existing collective bargaining agreement); *Milwaukee Terminal Servs.*, 282 NLRB 637, 639 (1987) (rejecting economic necessity defense to employer's unilateral changes made after expiration of an existing contract). NLRA precedent does recognize an exception to bargaining requirements where there are extraordinary unforeseen economic exigencies having a major economic effect that require the employer to take immediate action. *See* NLRB, GC 20-04: Case Summaries Pertaining to the Duty to Bargain in Emergency Situations (Mar. 27, 2020), *available at* https://www.nlrb.gov/guidance/memos-research/general-counsel-memos.

With this background in mind, the Department finds there is insufficient justification to merit exercising any flexibility accorded to the Department to accommodate the unique circumstances of states and localities to collective bargaining procedures. The 2019 Determination did not set forth evidence establishing that California's budget constraints constituted compelling economic circumstances that would justify excusing the requirement to collectively bargain with transit workers about significant aspects of defined benefit plans. There is insufficient evidence to support its conclusion that the budgetary concerns behind PEPRA's enactment were such that they merited special consideration when determining whether collective bargaining rights have been continued within the meaning of Section 13(c). As such, unique state and local circumstances here do not justify overlooking the limitations that PEPRA imposes on the collective bargaining relationship between transit agencies and workers.

State Law Backdrops

Lastly, the Department does not conclude that PEPRA should more properly be considered a permissible state law backdrop for collective bargaining rather than an intrusion on collective bargaining rights. *See Cal. II*, 2016 WL 4441221, at *21-26; *Cal. I*, 76 F. Supp. 3d at 1143. Section 13(c) does not preempt PEPRA, and an NLRA-preemption analysis is unnecessary. *See Jackson Transit Auth.*, 457 U.S. at 25 n.8, 27 (explaining legislative history that clarifies that "Section 13(c) would not supersede state law," and reflects "congressional intent that the Federal Government be able to seek changes in state law and ultimately to refuse financial assistance when state law prevented compliance with § 13(c)"). To the extent preemption cases can be useful in determining whether a state law violates Section 13(c), they support the conclusion that PEPRA improperly intrudes on collective bargaining rights, as thoroughly discussed in the 2015 Determinations. *See* 2015 Determinations at 13-16.

As the 2015 Determinations explain, PEPRA does not resemble the kind of law that survives the NLRA preemption analysis under the doctrine set forth in *Lodge 76, International Association of Machinists v. Wisconsin Employment Relations Commission*, 427 U.S. 132, 140 (1976). PEPRA cannot properly be characterized as a state law setting minimum labor standards or mandating certain benefits that does not intrude into the processes of collective bargaining. *See Metropolitan Life Insurance Co. v. Massachusetts*, 471 U.S. 724, 727, 751-58 (1985) (upholding a state law requiring insurance policies to provide mental health coverage where the law had only the most indirect effect on employees' self-organization and collective bargaining); *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 21-22 (1987) (finding not preempted a state law requiring employers to provide a one-time severance payment to employees affected by a plant closing). PEPRA establishes ceilings and prohibits negotiation over aspects of defined benefit pensions; it does not set minimum standards. With its substantive mandates, PEPRA "virtually dictate[s] the results" of defined benefit pension provisions of collective bargaining agreements. *See Chamber of Commerce v. Bragdon*, 64 F.3d 497, 501 (9th Cir. 1995) (finding preempted a county ordinance that imposed a detailed wage and benefit scheme for construction projects within the county).

PEPRA differs from the state laws noted above in another manner: it is not a general law seeking to regulate all state citizens, private and public. Rather, PEPRA involves the state "acting as an employer," an area where the state "has a much narrower latitude to enact laws that trench upon the terms of a collective bargaining agreement negotiated under the regime of federal labor laws." *See Hull v. Dutton*, 935 F.2d 1194, 1198 (11th Cir. 1991). Ignoring PEPRA's intrusion on collective bargaining and treating it as only a backdrop would "give the State tremendous liberty to abrogate collective bargaining contracts with its own employees under the guise of enacting a 'minimum labor standard.'" *Id.* at 1199. States could eviscerate Section 13(c)'s protections merely by passing laws defining benefits available to public employees. Section 13(c) was clearly enacted to prevent such a result. *See Jackson Transit Auth.*, 457 U.S. at 25 n.8 (noting "congressional intent that the Federal Government be able to seek changes in state law and ultimately to refuse financial assistance when state law prevented compliance with § 13(c)"); *Donovan*, 767 F.2d at 948 (explaining it was "Congress' clear intent to measure state labor laws against the standards of collective bargaining established by federal labor policy").

The Department is not persuaded by the district court's contrary conclusion that PEPRA presents "no substantial inconsistency with federal labor policy." *Cal. II*, 2016 WL 4441221, at *21-26. The Department does not base its decision-making on the five factor test the court constructed and used to reach this conclusion. None of the Department's recent in-depth examinations of the statutory language and legislative history of Section 13(c) yielded the conclusion that Congress intended a preemption analysis to govern the Secretary's conclusions about what arrangements are fair and equitable. *See* 2019 Determination, 2015 Determinations, 2013 Determinations. Moreover, most of the factors, as applied by the district court, seem ill-suited to making any necessary nuanced distinctions between state laws affecting transit employee rights to varying degrees. Only the last factor (whether the law clashes with the goal of encouraging collective negotiation) seems directly aligned with Section 13(c)'s purpose, and this was the only factor the court found weighed in favor of finding PEPRA impermissibly intruded on collective bargaining. *See id.* at 25. The other four factors (the first, second, third, and fourth) seem unhelpful when

13

evaluating the significance of state laws affecting transit workers' rights as they will likely not weigh in favor of finding a violation of Section 13(c) no matter the impact of the state law.

The district court found the first factor (whether the state law concerns deeply-rooted state interests) could not resolve in favor of the Department's position because PEPRA reflected "an overarching concern with a broad and traditional state interest: the budget." *Id.* at *24. A state's budget will likely be implicated whenever a state enacts cost-saving measures cutting employee benefits. Taken to its logical conclusion, this factor provides no protection against a state law that dramatically cuts benefits bargained for by transit workers.

The court found that the second factor (whether the state law is generally applicable) could not weigh in favor of the Department's position because California enacted PEPRA rather than the transit agencies, with whom the transit workers directly bargained. *Id.* at *25. Thus, this factor would never weigh in favor of finding a state law significant so long as public transit workers fall under the authority of a sub-agency of the state. Taken to the logical conclusion, it would mean Section 13(c) provides no protection against generally applicable state law unless there is a direct relationship between the state and the transit worker. This interpretation would be contrary to Section 13(c)'s purpose to protect transit workers against state laws that interfere with collective bargaining rights. *See Jackson Transit Auth.*, 457 U.S. at 25 n.8; *Donovan*, 767 F.2d at 948.

The court found that PEPRA was neutral as to the third factor (whether the state law is directed toward the protection of workers' interests) even though "PEPRA's changes increase the share of pension costs borne by employees and are intended to alleviate California's financial burdens as employer." *Cal. II*, 2016 WL 4441221, at *25. Still, the district court found that the third factor did not support the Department's position because "[i]t is not clear . . . that a state law conflicts with federal policy simply because its substantive result may tend to favor employers" and since transit agencies and employees could still engage in negotiations to offset PEPRA's effects. *Id.* This factor, at least as applied by the district court, does not seem useful in measuring intrusion on employees' collective bargaining rights if it returns an inconclusive result as to a law clearly and admittedly directed at improving the employer's interests at the cost of workers' interests.

Lastly, the court found that the fourth factor (whether the state law essentially dictates the substantive result of collective bargaining) was not met because transit workers could bargain around and within the restrictions of PEPRA. *Id.* at *25. Laws like PEPRA capping allowable benefits do dictate a substantive result: they dictate an agreement with benefits lower than the cap. As applied by the district court, the effect of these caps cannot be taken into account. Presumably, this factor could only weigh in favor of recognizing a significant intrusion if the state removed entire subject(s) of collective bargaining from the table or prohibited any further collective bargaining. This factor, like the first and second, therefore is not capable of making nuanced distinctions between state laws impacting transit workers' rights. As such, the Department does not find the district court's preemption analysis to provide a workable standard for evaluating state law's interference with collective bargaining relationships protected by federal law. Nor, as explained above, does the Department believe that the realities of public sector bargaining or California's unique circumstances provide a justification for PEPRA's interference with collective bargaining rights.

**Conclusion**

In enacting PEPRA, California placed new and significant limits on the scope of permissible pension benefits for its public transit workers, affecting the collective bargaining relationships that its transit agencies had agreed to preserve and continue as a condition of continued receipt of federal transit assistance. For many years following the enactment of PEPRA, the Department took the position that PEPRA constituted an impermissible interference with the collective bargaining rights protected by Section 13(c). The Department changed positions in 2019, relying on district court opinions enjoining the Department from denying certification and reasoning that Section 13(c) granted the Department the discretion to certify despite PEPRA's effects.

As explained above, the Department believes that its original position was better reasoned and supported. PEPRA's impact on transit workers' collective bargaining rights is material and significant even if it does not eliminate collective bargaining over pension benefits altogether or alter collective bargaining procedures. The Department does not find it appropriate to overlook PEPRA's impact as an accommodation to the realities of public sector bargaining, as part of the complexities of adapting principles of federal labor policy to state law or local circumstances, or by characterizing the law as simply a state "backdrop." The Department arrives at its assessment of PEPRA as an impermissible interference with collective bargaining rights even following a permissive view of the Department's discretion under Section 13(c). As such, the Department determines, on a prospective basis, that it is not appropriate for it to certify that there are fair and equitable arrangements in place to protect the employees of California transit agencies, and it accordingly overrules the legal positions expressed in its 2019 Determination.


Sincerely,



Andrew D. Auerbach
Deputy Director



cc:    See Certifications

# EXHIBIT 2

**U.S. Department of Labor**     Office of Labor-Management Standards
Washington, DC 20210



September 12, 2025


Daniel B. Smith, General Counsel
Amalgamated Transit Union
10000 New Hampshire Avenue
Silver Spring, MD 20903-1706
Email: 13c@atu.org

Re:     RESPONSE TO OBJECTIONS TO EMPLOYEE PROTECTION TERMS FOR
        PENDING FTA GRANT APPLICATION
        CA-2025-235-00
        San Mateo County Transit District

Dear Mr. Smith:

This is in response to your September 2, 2025, objection to the Terms for Employee Protection
Certification contained in the Department's referral for the above-referenced grant. Pursuant to
Department Guidelines (29 C.F.R. Part 215), your objection was timely received. However, the
Department previously addressed the issue that you raise in its March 31, 2025, response to
objection (concerning Alameda-Contra Costa Transit District – CA-2025-022-00; CA-2025-026-
00; CA-2025-027-00; CA-2025-031-00 Central Contra Costa Transit Agency – CA-2025-016-00
Riverside Transit Agency – CA-2025-018-00). Therefore, no further action by the Department is
required in this instance.

The Department will proceed to certification in accordance with this decision.


Sincerely,

Andrew C. Hasty
Policy and Law Advisor
Division of Interpretations and Regulations


cc: See referral

# EXHIBIT 3

**U.S. Department of Labor**     Office of Labor-Management Standards
Washington, D.C. 20210



September 12, 2025

Ray Tellis, Regional Administrator
Federal Transit Administration, Region IX
90Seventh Street, Suite 15-300
San Francisco, CA 94103-1839

Re:    U.S. Department of Labor 49 U.S.C. § 5333(b) Certification
       FTA Grant Application CA-2025-235-00
       San Mateo County Transit District

Dear Regional Administrator:

This is in reply to the U.S. Department of Transportation, Federal Transit Administration's request for certification of employee protective provisions for the above-referenced grant application under 49 U.S.C. § 5333(b). The protective arrangements identified below provide protections that satisfy the requirements of 49 U.S.C. § 5333(b). Revisions and/or amendments to this grant may be subject to additional certification in accordance with 29 C.F.R. § 215.

| GRANTEE:  San Mateo County Transit District | |
|---|---|
| Employee Representation | Protections |
| Amalgamated Transit Union Local 1574 | Capital and Operating Assistance: Agreement dated 10/27/1976 |
| Amalgamated Transit Union Local 1575 (SAMTRANS) | Capital and Operating Assistance: Determination dated 12/27/1995 , including Attachment A dated 12/15/1995 |
| Service Area Provider: Alameda-Contra Costa Transit District | |
| Employee Representation | Protections |
| Int'l Brotherhood of Electrical Workers; Amalgamated Transit Union Local 192; American Federation of State, County and Municipal Employees Local 3916 | Capital and Operating Assistance: Unified Protective Arrangement dated 01/03/2011 |

| GRANTEE:  San Mateo County Transit District | |
|---|---|
| Employee Representation | Protections |
| Service Area Provider: Caltrain Commuter Rail | |
| Employee Representation | Protections |
| American Train Dispatchers Ass'n; Brotherhood of Locomotive Engineers/IBT; Brotherhood of Maintenance Way Employees Division/ IBT; Brotherhood of Railroad Signalmen; Brotherhood Railway Carmen Division/TCU; Int'l Ass'n of Machinists and Aerospace Workers; Int'l Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers, and Helpers; Int'l Brotherhood of Electrical Workers - Rail Div.; National Conference of Firemen and Oilers; Int'l Ass'n of Sheet Metal, Air, Rail and Transportation Workers - Mech. Div.; Int'l Ass'n of Sheet Metal, Air, Rail and Transportation Workers - Transp. Div.; Transport Workers Union | Capital and Operating Assistance: Unified Protective Arrangement dated 01/03/2011 |
| Service Area Provider: Capitol Corridor | |
| Employee Representation | Protections |
| Brotherhood of Locomotive Engineers/IBT; Brotherhood of Maintenance Way Employees Division/ IBT; Int'l Ass'n of Bridges, Structural, Ornamental and Reinforcing Iron Workers; Int'l Ass'n of Machinists and Aerospace Workers; Int'l Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers, and Helpers; Int'l Brotherhood of Electrical Workers - Rail Div.; National Conference of Firemen and Oilers; Int'l Ass'n of Sheet Metal, Air, Rail and Transportation Workers - Mech. Div.; Int'l Ass'n of Sheet Metal, Air, Rail and Transportation Workers - Transp. Div.; Transport Workers Union; Transportation Communications Union | Capital and Operating Assistance: Unified Protective Arrangement dated 01/03/2011 |
| Service Area Provider: City and County of San Francisco Municipal Transit Agency | |
| Employee Representation | Protections |
| Transport Workers Union Local 250A | Capital and Operating Assistance: Unified Protective Arrangement dated 01/03/2011 |
| Service Area Provider: City of East Palo Alto | |
| Employee Representation | Protections |
| Int'l Brotherhood of Teamsters Local 665 | Capital and Operating Assistance: Unified Protective Arrangement dated 01/03/2011 |
| Service Area Provider: San Francisco Bay Area Rapid Transit District | |
| Employee Representation | Protections |
| BART Police Managers Ass'n; BART Police Officers Ass'n; Amalgamated Transit Union Local 1555; American Federation of State, County and Municipal Employees Local 3993; Service Employees Int'l Union Local 390 | Capital and Operating Assistance: Unified Protective Arrangement dated 01/03/2011 |

| GRANTEE: San Mateo County Transit District | |
|---|---|
| Employee Representation | Protections |
| Service Area Provider: San Francisco Bay Area Water Emergency Transportation Authority | |
| Employee Representation | Protections |
| Inlandboatmen's Union of the Pacific (N. CA); Marine Engineers' Beneficial Ass'n California; Int'l Organization of Masters, Mates and Pilots-Pacific Maritime Region | Capital and Operating Assistance: Unified Protective Arrangement dated 01/03/2011 |
| Service Area Provider: Santa Clara Valley Transportation Authority | |
| Employee Representation | Protections |
| American Federation of State, County and Municipal Employees; Service Employees Int'l Union Local 521; Amalgamated Transit Union Local 265; Int'l Fed'n of Prof'l and Technical Engineers Local 21 (Santa Clara Co. Eng'rs and Architects Ass'n) | Capital and Operating Assistance: Unified Protective Arrangement dated 01/03/2011 |
| Service Area Provider: Western Contra Costa Transit Authority | |
| Employee Representation | Protections |
| Int'l Brotherhood of Teamsters Local 315 | Capital and Operating Assistance: Unified Protective Arrangement dated 01/03/2011 |

The Department of Labor makes the certification called for under the statute for the instant project on condition that:

1. As a precondition to the release of assistance, this letter and the terms and conditions of the protective arrangements referenced above shall be made applicable to the instant project and made part of the contract of assistance between the Grantee and the U. S. Department of Transportation, by reference;

2. The term "project" as used in each of the respective protective arrangements referenced above shall be deemed to cover and refer to those portions of the instant project to which they have been applied;

3. The protective arrangements certified by the Secretary of Labor are intended for the primary and direct benefit of transit employees in the service area of the project. These employees are intended third-party beneficiaries to the employee protective arrangements referenced in the grant contract between the U.S. Department of Transportation and the Grantee, and the parties to the contract so signify by executing that contract. Such transit employees are also third-party beneficiaries to the protective arrangements incorporated in any subsequent contract(s) of assistance between the Grantee and any Recipient(s). Employees not represented by any labor organization, or if so represented through their representative on their behalf, may assert claims with respect to the protective arrangements under this provision. This clause creates no independent cause of action against the United States Government;

4. Disputes over the interpretation, application and enforcement of the terms and conditions of the certified protective arrangements, including those disputes arising out

of this letter of certification, shall be resolved in accordance with the procedures specified in the aforementioned certified arrangements; and

5.    (a) Employees of mass transportation providers in the service area of the project who are not identified in the chart above who are represented by a union for purposes of collective bargaining (including any diminutive form of collective bargaining rights of public employees such as they exist under state law (e.g. meet and confer) shall be afforded the protections contained in the January 3, 2011 Unified Protective Arrangement (UPA).

(b) Employees of mass transportation providers in the service area of the project, whether identified in the chart above or not, who are not represented by a union for purposes of collective bargaining (including any diminutive form of collective bargaining rights of public employees such as they exist under state law (e.g. meet and confer) shall be afforded the protections contained in the July 8, 2024 Nonunion Protective Arrangement (NPA).

Sincerely,

Andrew Hasty
Team Leader
Office of Labor-Management Standards
Department of Labor
OLMS-DSP@dol.gov
(202) 693-1262

cc:      Evelyn Ng / SAMTRANS
         Heather Salem / SAMTRANS
         Peter Skinner / SAMTRANS
         AFSCME / AFSCME
         ATU / ATU
         Adam Vokac / MEBA
         Al Russo / IBEW
         Al Russo / IBEW Rail
         C. Studivant / SMART-TD
         Caitlin Cooper / ATDA
         Connie Vallas / BRC/TCU
         Cris Sogliuzzo / IBU
         Curtis Tate / TWU
         Curtis Tate / TWU L. 250A

Donald Marcus / MMP
Eric Dean / IW
Faraz Khan / IFPTE
IBT / BLE/IBT
Jeff Duncan / MEBA-CA
Katherine Andrews / ATU L. 1575 (Samtrans)
Keith Garcia / BART-PMA
Kenneth Cooper / IBEW
Lee Saunders / AFSCME
Loren Fortune / IBT
Marina V. Secchitano / IBU-CA N.
Mark Murphy / AFSCME
Paul Shearon / IFPTE L. 21
Richard Edelman / ATDA
Robert Estrada / IBU-CA N.
Rod Tanner / IAM
SEIU / SEIU
SEIU / SEIU L. 390
Sean M. O'Brien / IBT
Shane Reiss / BART-POA
Sly Hunter / MMP-Pac
Steven K. Ury / SEIU
Tom Woods / IBT L. 665

Attachments:  CA-2025-235-00.pdf

# EXHIBIT 4

**U.S. Department of Labor**     Office of Labor-Management Standards
Washington, D.C. 20210



June 14, 2019

Robert Molofsky, General Counsel
Amalgamated Transit Union
10000 New Hampshire Avenue
Silver Spring, MD 20903
Email: 13c@atu.org

Re:     RESPONSE TO OBJECTIONS TO EMPLOYEE PROTECTION TERMS
FOR PENDING FTA GRANT APPLICATIONS
CA-03-0806-04 and CA-90-Z117
Sacramento Regional Transit District and Caltrans *on behalf of* Monterey-Salinas Transit;
and
Alameda-Contra Costa Transit District, CA-2017-017-01 and CA-2019-011;
Golden Gate Bridge, Highway and Transportation District, CA-2019-041;
Los Angeles County Metropolitan Transportation Authority, CA-2018-012-01 and CA-2018-093-01;
Riverside Transit Agency, CA-2019-048;
San Francisco Bay Area Rapid Transit District, CA-2019-029;
San Joaquin Regional Transit District, CA-2019-034;
San Mateo County Transit District, CA-2017-104-01;
Santa Clara Valley Transportation Authority, CA-2018-081-01 and CA-2019-047

Dear Mr. Molofsky:

This is in response to your November 29, 2018 letter, in which Amalgamated Transit Union
(ATU) Local 1225 and Local 256 registered certain objections to the Proposed Terms for
Employee Protection Certification contained in the Department of Labor's (Department) referral
letters of November 16, 2018 for CA-03-0806-04 and CA-90-Z117.  This letter also responds to
ATU's objections to the other above captioned grant applications. Pursuant to Department
Guidelines (29 CFR Part 215), all of the objections were timely received.

With regard to grants CA-03-0806-04 and CA-90-Z117, ATU asserted that the Department's
sole rationale for proposing to certify the current grant is to comply with the decisions of the
U.S. District Court for the Eastern District of California.  *See California v. U.S. Dep't of Labor*,
306 F. Supp. 3d 1180 (E.D. Cal. 2018) (final decision).  ATU in turn objected to the
Department's proposed certification on the basis that it would be premature and improper to
certify the grant in order to comply with the district court's decisions given that an appeal is still
pending before the United States Court of Appeals for the Ninth Circuit.  ATU noted that while
the Department moved to voluntarily dismiss the appeal, ATU moved to intervene for the
purpose of taking over the Department's appeal.

1

After ATU submitted its objection, the Ninth Circuit denied ATU's motion to intervene and dismissed the appeal. ATU's objection regarding the pendency of the appeal is therefore moot. As such, the Department determines in accordance with the Guidelines at 29 C.F.R. § 251.3 that ATU's objection to CA-03-0806-04 and CA-90-Z117 is not sufficient.

Regarding the remaining grants, ATU objects to the Department's proposed certification due to PEPRA's (California Public Employees' Pension Reform Act (PEPRA), Cal. Gov't § 7522 et seq.,) effect on transit employees' collective bargaining rights.

In light of the district court's decisions, the Department has reexamined its earlier determinations denying certification pursuant to section 13(c) of the Urban Mass Transportation Act (UMTA), now codified at 49 U.S.C. § 5333(b) (hereinafter "section 13(c)"), to these grants because of the PEPRA's impact on transit employees. Based on that reexamination, the Department has concluded that PEPRA does not present a bar to certification under section 13(c).

### Background and Procedural History

The facts were set out in the Department's previous correspondence issued on September 4, 2013, September 30, 2013, and August 13, 2015. As such, only a brief summary of the relevant facts and subsequent procedural history is provided here.

The Sacramento Regional Transit District (SacRTD) and the California Department of Transportation (Caltrans) on behalf of Monterey-Salinas Public Transit System Joint Powers Agency d/b/a Monterey-Salinas Transit (MST) first submitted the grants at issue to the Federal Transit Administration in 2012. The Federal Transit Administration forwarded the grants to the Department with a request for certification pursuant to section 13(c), which requires that the Department certify that "fair and equitable" arrangements are in place to protect the interests of affected employees before state and local transportation agencies can receive federal mass transit funding assistance. *See* 49 U.S.C. § 5333(b). Those arrangements "shall include provisions that may be necessary for," *inter alia*, "the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise," and "the continuation of collective bargaining rights." 49 U.S.C. § 5333(b)(2)(A), (B).

The Department initially denied certification to SacRTD's application on September 4, 2013 and to MST's application on September 30, 2013, on the basis that PEPRA precluded certification. PEPRA, enacted in 2012, reformed California's public employee pension system and applies to most California public employees, including transit employees affected by these grants. Among other requirements, PEPRA mandates that public employees hired after 2013: contribute at least 50% of the cost of their pension benefits; establish minimum time-in-service requirements; caps the pension benefits they can receive; and prescribes the calculation of their pension benefits at retirement. PEPRA also changes some aspects of pensions for public employees hired before 2013, including ending employees' ability to purchase service credit for non-working time ("airtime"). SacRTD and MST transit employees had collective bargaining agreements in place in 2013 that provided defined benefit pension plans with more employee-favorable terms than

those permitted by PEPRA.  The Department determined that PEPRA's unilateral changes to pension benefits without bargaining were inconsistent with section 13(c)(1)'s mandate to preserve pension benefits under existing collective bargaining agreements and section 13(c)(2)'s mandate to ensure continuation of collective bargaining rights.

The transit agencies sought review of the Department's determination in federal district court.  In a December 30, 2014 decision, the court held that the Department's determinations were arbitrary and capricious.  *California v. U.S. Dep't of Labor*, 76 F. Supp. 3d 1125 (E.D. Cal. 2014).  Among the reasons the court provided was that the Department erred in "reflexively" relying on *Amalgamated Transit Union v. Donovan*, 767 F.2d 939 (D.C. Cir. 1985), in light of the factual differences between that case and the circumstances here, which involved "a state's system-wide changes in some aspects of public employment."  76 F. Supp. 3d at 1143.  Additionally, the court found that the Department's conclusion that PEPRA prevented collective bargaining over pensions was erroneously premised on an assumption that a pension must necessarily be a defined benefit rather than a defined contribution plan.  *Id.* at 1143.  The court further stated that the Department was arbitrary and capricious in, *inter alia*, "fail[ing] to consider the realities of public sector bargaining," and in determining that not yet hired employees had rights under collective bargaining agreements.  *Id.* at 1144-45.  The court remanded the matter to the Department for further proceedings consistent with its decision.  *Id.* at 1148.

On August 13, 2015, the Department issued new final determinations denying section 13(c) certifications.  The Department explained its interpretation that the lessening or diminution of collective bargaining rights as accomplished by PEPRA violates section 13(c), drawing support from the statute's text, legislative history, and case law establishing that the commonly understood meaning of collective bargaining precludes unilateral changes to mandatory subjects of collective bargaining.  The Department also explained its disagreement that the factors and issues identified by the court supported certification of the grants.  The transit agencies challenged the new final determinations, and the district court ruled that they were arbitrary and capricious.  *California v. U.S. Dep't of Labor*, 306 F. Supp. 3d 1180 (E.D. Cal. 2018) (hereinafter 2018 Decision); *California v. U.S. Dep't of Labor*, No. 2:13-CV-02069-KJM-DB, 2016 WL 4441221 (E.D. Cal. Aug. 22, 2016) (hereinafter 2016 Decision).  The court found that the statutory text and legislative history of section 13(c) were ambiguous as to whether section 13(c)(2)'s provision requiring "the continuation of collective bargaining rights" protected those rights from a diminishing or lessening that fell short of elimination.  2016 Decision, 2016 WL 4441221, at *9-12, 15-17.  The court noted, however, that the history of the statute suggested that the provision was "motivated primarily by larger-scale restrictions on collective bargaining rights."  *Id.* at *17.  The court also determined the Department erred in relying on case law establishing that even minimal unilateral changes by an employer could violate the statute because Congress' intent was not to apply all National Labor Relations Act (NLRA) law to states through the UMTA.  *Id.* at *19-20.  The court determined that PEPRA was a permissible state law "backdrop" for collective bargaining because it did not substantially interfere with federal labor policy.  *Id.* at *21-26.  The court also determined the Department erred in failing to explain why the transit authority's ability to negotiate for other types of benefits did not make up for any change made by PEPRA.  *Id.* at *27-28.

3

The district court also ruled that the Department had been arbitrary or capricious in concluding that there were not adequate arrangements in place to preserve the pension rights of MST employees hired before 2013 ("classic employees").  2018 Decision, 306 F. Supp. 3d 1180.  The court reasoned that section 13(c)(1)'s obligation to preserve rights and benefits was intended "to prohibit only those changes that harm or diminish bargained-for rights" in a manner that is not trivial.  *Id.* at 1186-87.  The court determined that PEPRA's change to classic employees' airtime rights "was not sufficiently meaningful to trigger § 13(c)(1)."  *Id.* at 1189.  The court enjoined the Department from relying on PEPRA to deny California's application of funding for MST or SacRTD under section 13(c)(1) or (2).  *Id.* at 1190.  The Department initially appealed the court's decisions, but on November 5, 2018, moved voluntarily to dismiss the appeal.  On December 19, 2018, the Ninth Circuit denied ATU's motion to intervene and dismissed the appeal.

Pursuant to its Procedural Guidelines, 29 C.F.R. § 215, the Department refers grant applications and proposed protective arrangements and terms and conditions to:  the recipient and any subrecipient of the funding, and any unions representing employees of the recipient(s), its contractors, and/or other service area providers.  Following these guidelines, on November 16, 2018, the Department re-referred the grant applications at issue in the litigation on the basis of the previously certified protective arrangements.

Once a grant application is referred to the parties, the parties have fifteen days to inform the Department of any objection to the recommended terms.  For the Department to find an objection sufficient, it must "raise" material issues that "may require alternative employee protections," or "concern changes in legal or factual circumstances that may materially affect the rights or interests of employees."  29 C.F.R. § 215.3(d)(3).  If no party objects or the Department does not find the objection sufficient, the Department certifies the proposed terms.  The Department then provides FTA with a certification specifying the protective arrangements and terms and conditions to be made applicable to the federal assistance.  29 C.F.R. § 215.3(d)(5).  After reviewing the above listed objections, the Department concludes that no sufficient objections have been raised.

**Analysis**

Analysis of sections 13(c)(1) and (2)

After the district court's decisions, the Department independently reexamined the scope of its authority under section 13(c) and the best way to provide fair and equitable employee protective arrangements.  The Department now concludes that Section 13(c) grants the Secretary broad discretion in determining whether there are adequate "employee protective arrangements." 49 U.S.C. § 5333(b).  The protective arrangements required as a condition of financial assistance are those that "the Secretary concludes are fair and equitable."  *Id.* (emphasis added).  The plain terms of the statute make clear the deference to be afforded to the Secretary's judgment of what provisions are fair between an employer and employees.  *See Kendler v. Wirtz*, 388 F.2d 381, 384 (3d Cir. 1968) ("It is for the reasonable accommodation of unavoidably conflicting interests . . . that the Congress has seen fit to make the judgment of the Secretary of Labor as to what is fair and equitable controlling."); *cf. City of Los Angeles v. U.S. Dep't of Commerce*, 307 F.3d 859,

870-71 (9th Cir. 2002) (holding that statute providing that the Secretary of Commerce "shall, if he considers it feasible," use statistical sampling, vests "meaningful discretion" on the Secretary to set a standard for feasibility and to determine whether the standard has been met); *Connecticut Dep't of Children & Youth Servs. v. Department of Health & Human Servs.*, 9 F.3d 981, 985-86 (D.C. Cir. 1993) (statute requiring that specified procedures and programs must be implemented to the "satisfaction of the Secretary" constituted an "extraordinary grant of discretion" to the Secretary, subject to reversal only for an "egregious claim"); *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1224-25 (D.C. Cir. 1993) (statute empowering Secretary to provide "such other exceptions and adjustments * * * as the Secretary deems appropriate" grants "broad delegation of discretion" subject to "quite narrow" judicial review).

The statutes provides that the Secretary must conclude that each of the five[1] different varieties of protective provisions that must be included among the § 13(c) arrangements are fair and equitable. But the Secretary still retains broad discretion in evaluating fairness and equity vis-à-vis each of the five objectives. *Kendler v. Wirtz*, 388 F.2d 381, 383 (3d Cir. 1968). Section 13(c) directs that the "[a]rrangements . . . shall include provisions that <u>may be necessary</u>" to meet these five objectives. 49 U.S.C. § 5333(b)(2) (emphasis added). The use of the permissive term "<u>may be necessary</u>" underscores the breadth of the Secretary's discretion under section 13(c) to determine what provisions are needed to satisfy the five requirements. *See Amalgamated Transit Union Int'l, AFL-CIO v. Donovan*, 767 F.2d 939, 944 n.7 (D.C. Cir. 1985) (differentiating requirement that the Secretary determine all five objectives are satisfied prior to certification from Secretary's discretion to determine "whether or not a specific provision within a labor agreement satisfies one of section 13(c)'s express objectives").

In this case, the Secretary must determine whether arrangements satisfy section 13(c)'s objectives of "preservation of . . . benefits . . . under existing collective bargaining agreements" and "continuation of collective bargaining rights." 49 U.S.C. § 5333(b)(2)(A)&(B). As the district court correctly recognized, the terms "continuation" and "preservation" could be construed strictly to mean that no changes can be made to employees' collective bargaining rights, or more leniently to mean that the rights must only be substantially continued or preserved. *See* 2016 Decision, 2016 WL 4441221, at *10-12; *see also Random House Webster's Unabridged Dictionary* 440 (2d ed. 2001) ("continuation" means "something that continues some preceding thing by being of the same kind or having a similar content"). The statutory text permits either interpretation.

Although courts and the Department have looked to the legislative history of section 13(c), that history does not fully resolve the ambiguity in the meaning of "continuation" and "preservation." As the Department explained in its earlier determinations, Senator Wayne Morse, section 13(c)'s sponsor, indicated that the provision was designed to avoid a "lessening" or "worsening" of rights, suggesting Congress could have been concerned about any diminishment of rights. *See* 109 Cong. Rec. 5671-72 (1963). Senator Morse's reference to "lessening" or "worsening" may be considered in context as opposition to a committee bill's mere encouragement of the continuation of collective bargaining rights, however. In that context, he could have been using

---

[1] As previously codified, section 13(c) enumerated five subsections. *See* 49 U.S.C. § 1609(c) (1988). In 1994, the text of the statute as codified was revised to separate the fourth assurance into two separate lettered paragraphs, which is how it remains today. *See* 49 U.S.C. § 5333(b)(2)(d) and (e) (1994).

the terms at a high level of generality to oppose the "lessening" or "worsening" that would result if states were only encouraged to continue collective bargaining rights, *i.e.*, a system in which collective bargaining rights would not be entirely eliminated but preserved only partially and to varying degrees in different states. The legislative history does not show that legislators had a settled conception that any lessening in rights in a particular collective bargaining relationship, no matter how minor, would necessarily fail to preserve rights under an existing collective bargaining agreement or discontinue the right to bargain collectively.

The purpose and context of the statute, however, do suggest that an appropriate interpretation is that the statute does not preclude certification in all circumstances where there may be diminishments in collective bargaining rights and benefits. Section 13(c)'s purpose was to allow the Secretary to accommodate states' unique circumstances while ensuring fairness and equity and the "legislative history stress[es] the need for flexibility and discretion." *Local Div. 589, Amalgamated Transit Union, AFL-CIO, CLC v. Mass.*, 666 F.2d 618, 634 (1st Cir. 1981). It would be contrary to this flexible design to conclude that any change in state law over the years that affects bargaining rights or benefits of its public sector employees means the Secretary would lose any discretion in determining whether the requirements of the statute are met.

It is also revealing that section 13(c)'s purpose was not to "subject local government employers to the precise strictures of the NLRA." *Donovan*, 767 F.2d at 949; *see also Jackson*, 457 U.S. at 28 ("Congress designed § 13(c) . . . to accommodate state law to collective bargaining, not as a means to substitute a federal law of collective bargaining for state labor law."). During debate, Senator Morse assured Senator Goldwater that section 13(c) did not disturb the NLRA's exemption of state and local governments from its requirements. *See* 109 Cong. Rec. 5674 (1963). Senator Morse also clarified that workers would not retain the right to strike after becoming employed by a state that forbade strikes by public employees. *See id.* at 5672. Despite the loss of this economic weapon, Congress did not explicitly require workers be given some other right to compensate for the loss. *See Donovan*, 767 F.2d at 953-55. In fact, the *Donovan* court suggested that it may be proper under 13(c) to allow wage disputes, which are universally acknowledged to lie at the heart of collective bargaining, *id.* at 950-51, to be resolved through "good faith" collective bargaining supported, if necessary, by non-binding mandatory, meaningful fact-finding. This indicates that Congress did not intend that the Department apply with rigidity the requirements of the NLRA when interpreting section 13(c) requirements and recognized that the transition from private workers protected by the NLRA to public employees exempt from it would necessarily entail a loss of some collective bargaining rights, including the right to bargain over a no-strike clause. Consequently, it is reasonable not to apply with rigidity to section 13(c) arrangements the rule that private employers may violate the NLRA by making "[e]ven minimal unilateral changes to terms and conditions of employment." *See* 2016 Decision, 2016 WL 4441221, at *19. Rather, section 13(c)'s purpose and context suggest that not all changes to bargaining rights and benefits accomplished through state law preclude certification.

This more lenient interpretation of the meaning of "continuation" and "preservation" provisions in section 13(c) is not inconsistent with the relevant case law. It follows the California district court's decisions. *See* 2018 Decision, 306 F. Supp. 3d at 1187 (explaining section 13(c) protects affected employees against "meaningful negative changes to rights and benefits conferred by their then-existing collective-bargaining agreements"). It also does not conflict with the D.C.

Circuit's opinion in *Donovan*. The D.C. Circuit explained Senator Morse's reference to "[m]aintaining the status quo" as usually meaning "*substantially* preserving collective bargaining rights that had been established by federal labor policy." *Donovan*, 767 F.2d at 948 (emphasis added). The D.C. Circuit therefore recognized that section 13(c) did not require the absolute preservation of all collective bargaining rights.

This interpretation is also consistent with case law recognizing that the Department's role is to ensure the arrangements are fair and equitable as opposed to ensuring the perpetuity of certain benefits or rights. Under section 13(c), the Department must certify as of the time of a pending grant application that the "protective arrangements" are "fair and equitable" under the five objectives, and, if the state were to change its law "'contrary to the policy of 13(c)'" and "'halt the flow of funds or take other appropriate action.'" *Donovan*, 767 F.2d at 948 n.9 (quoting *Local Div. 589*, 666 F.2d at 634). Only a change that is "basically unfair or inequitable" would be problematic since "Congress's general intent to secure fair arrangements does not require the implementation of any *particular* set of detailed provisions." *Local Div. 589*, 666 F.2d at 634 (emphasis added). These courts recognized that Congress granted the Department discretion to determine whether the agreement is fair and equitable, but section 13(c) does not require the Department to go beyond that role.

Application of section 13(c) in this case

The discussion above shows that section 13(c) does not compel the results the Department reached in 2013 and 2015. Instead, it shows that key statutory terms can be interpreted in different ways and that the Secretary has broad discretion to determine which fair and equitable arrangements may be necessary for "preservation of . . . benefits . . . under existing collective bargaining agreements" and "continuation of collective bargaining rights." 49 U.S.C. § 5333(b)(2)(A)&(B). As explained below, there are several reasons why the Department now determines that such arrangements exist despite PEPRA's impact on affected employees.

While PEPRA does make significant reforms to California's public employee pension system, the reforms do not substantially affect transit employees' benefits under existing collective bargaining agreements. PEPRA addresses only one substantive term of employment (pensions). PEPRA imposes few, if any, restrictions on other subjects of collective bargaining. Moreover, PEPRA does not preclude bargaining over pensions altogether, but rather caps defined benefit plans and their eligibility criteria prospectively while allowing bargaining over defined contribution plans. As attorneys representing California noted, "PEPRA does not stand as an obstacle to substantive bargaining over participation in, and contributions to, defined contribution qualified retirement plans such as a 401(k) or 457(b) plan, or other forms of deferred compensation as the parties may bargain." AR 001323. "In fact, nothing in PEPRA prohibits the negotiation of an actuarially equivalent retirement benefit to that which may have been allowable through a defined benefit pension prior to PEPRA." *Id.* Additionally, since some of PEPRA's changes to defined benefit plans only go into effect after the expiration of a collective bargaining agreement in effect on January 1, 2013, *see* Cal. Gov. Code § 7522.30(f), the law allowed time and opportunity for such negotiations. Therefore, the Department concludes that, despite PEPRA, the section 13(c) arrangements meet section 13(c)(2)'s standard

7

of "preservation of . . . benefits . . . under existing collective bargaining agreements." 49 U.S.C. § 5333(b)(2)(A).

PEPRA also does not impermissibly impair collective bargaining rights in violation of section 13(c)(2)'s standard of "continuation of collective bargaining rights." PEPRA does not interfere with the collective bargaining process. It leaves agencies and employees "free to negotiate around [PEPRA's] effects and within [its] restrictions." *See* 2016 Decision, 2016 WL 4441221, at *25. In fact, as the court noted, transit agencies and employees "have continued collective bargaining over other complementary pension strategies in the wake of PEPRA's enactment." *Id.* Such a determination is consistent with Congress' implicit acknowledgement that collective bargaining rights remain even if state law takes away an employee right without replacing it with an equivalent benefit. *See Donovan*, 767 F.2d at 953-55 (explaining that Congress recognized transition from private to public would result in the loss of the right to strike, but did not necessarily require employees be provided with some equivalent economic weapon).

Moreover, the Department concludes that the section 13(c) arrangements are "fair and equitable" despite PEPRA's requirements. As the court noted, even the NLRA "allows private employers to follow the dictates of economic necessity, so long as they bargain over the effects of management's decisions." 2016 Decision, 2016 WL 4441221, at *25. Section 13(c) therefore allows California some latitude to address a problem of economic necessity concerning its budget, especially given that the legislative history indicates that Congress did not intend the provision to result in a strict application of NLRA precedent and intended more flexible dealings with states. *See id.* at *24; *see also Local Div. 589*, 666 F.2d at 639 (explaining "[t]he state's 'paramount authority . . . extends to economic needs as well,'" and "the importance of allowing states to legislate freely on social and economic matters of importance to their citizens, modifying the law to meet changing needs and conditions" (quoting *Veix v. Sixth Ward Ass'n*, 310 U.S. 32, 39 (1940)).

In this instance, PEPRA was not aimed at undermining this collective bargaining system but at alleviating the state's serious financial problem of pension funding. The Department considers both PEPRA's unique purpose and its limited effect in deciding to certify the grants at issue. Since PEPRA's effect is limited to one area of collective bargaining, and that area remains open for bargaining over significant aspects of pensions, PEPRA does not prevent the parties from meeting their statutory minimum and the employee protective arrangements appear fair and equitable. Thus, the Department determines that PEPRA does not preclude certification of the grants at issue.

The Department recognizes the ATU's desire to defend the Department's 2013 and 2015 determinations not to certify the grants at issue based on PEPRA. The Department does not consider that position a sufficient reason to deny certification. Since the 2013 and 2015 determinations, the Department has changed its position in a number of ways. First, as the district court concluded, the Department previously improperly treated *Donovan* as controlling even though the law at issue in *Donovan* was materially different from PEPRA. The law in *Donovan* applied to one transit authority, was aimed at collective bargaining, and removed five subjects from the collective bargaining process. *Donovan*, 767 F.2d at 942-43. In contrast, PEPRA is a state-wide law applicable to public employees generally and is not directed to the

8

process of collective bargaining but rather addresses the substantive terms of employment in one respect (pensions), an area where states traditionally have latitude, and, as discussed above, it does not preclude bargaining over pensions altogether. In light of the district court's decision, and on reexamination of *Donovan*, the Department concludes that its earlier determinations should not have treated *Donovan* as controlling.

Second, the Department's earlier determinations gave insufficient consideration to terms in section 13(c), discussed above, that give discretion to the Department to interpret section 13(c)'s requirements. Third, the earlier determinations adopted definitions of statutory terms such as "continuation" and "preservation" that were not compelled by the statutory language or legislative history. As explained above and in the district court's decisions, section 13(c) grants the Secretary broad discretion to determine whether arrangements continue bargaining rights and preserve benefits even if a state law has made certain changes impacting collective bargaining rights and benefits of transit employees. *See* 2016 Decision, 2016 WL 4441221, at *20; 2018 Decision, 306 F. Supp. 3d at 1187. Fourth, the 2015 determination focused on NLRA precedents concerning the duty to bargain and preemption without sufficient consideration of UMTA's purpose and context, which indicate that the Department should not apply section 13(c) in a manner that reflexively incorporates NLRA precedent to a public sector setting.

Finally, the Department's earlier determinations gave too little weight to what the district court termed the realities of public sector collective bargaining. The district court's decisions and the statutory purpose and context of section 13(c) indicate that Congress intended the Department to exercise flexibility when accommodating state's public sector collective bargaining. The provisional purpose of Congress in enacting section 13(c) – to cushion the impact on transit employees of a change from private to public sector employment – is relevant in interpreting the scope of section 13(c)'s protections. The Department considered that purpose in more carefully examining the changes made by PEPRA to determine if there is still a sufficient continuation of rights and preservation of benefits. The Department determines that PEPRA's effects are sufficiently limited in scope and purpose so as to allow the Department to conclude the arrangements continue to exist that meet section 13(c)'s requirements for the continuation of collective bargaining rights and the preservation of rights, including continuation of pension rights and benefits under existing collective bargaining agreements.

Sincerely,

Arthur F. Rosenfeld, Director
Office of Labor-Management Standards

cc: See certifications

9

# EXHIBIT 5



# Amalgamated Transit Union

10000 New Hampshire Avenue, Silver Spring, MD 20903-1706
(301) 431-7100   Fax (301) 431-7117

September 2, 2025

**VIA EMAIL**

Andrew Hasty
Acting Chief
Division of Interpretations and Regulations
Office of Labor-Management Standards
U.S. Department of Labor
Room N5119
200 Constitution Avenue, NW
Washington, DC   20210

Re:     **OBJECTIONS TO REFERRAL TERMS**
FTA Application
San Mateo County Transit District
Metropolitan Planning
(CA-2025-235)

Dear Mr. Hasty:

The undersigned writes on behalf of, and as special "Section 13(c)" counsel for, ATU Locals 192, 265, 1555, 1574 and 1575 in reply to an August 18, 2025, electronic communication of the Labor Department pertaining to the above-referenced pending grant application and the employee protections which are to attach in connection therewith pursuant to the labor requirements of the Federal Public Transportation Act, 49 U.S.C. 5333(b).[1/]

---

[1/] For employees at SAMTRANS represented by ATU Local 1574, the DOL's proposed certification action is based upon the terms and conditions of the October 27, 1976, Section 13(c) Agreement executed by and between SAMTRANS and the local union. Regarding the interests of employees represented by ATU Locals 192, 1555, and 265, the DOL's proposed certification is premised upon the January 3, 2011, Unified Protective Arrangement.

Relative to the interests of those represented by Local 1575 at SAMTRANS, the DOL's proposed certification is premised upon the terms and conditions of the December 15, 1995, Section 5333(b) Arrangement, published as Appendix A to the DOL's December 27, 1995, certification relating to (CA-03-0395) and four other then-pending grant applications. On behalf of Local 1575, we urge that the Department's December 1995 failure to incorporate the separate and express "contractor-to-contractor" provisions sought by the Local was unreasoned and - particularly when considered in light of the contrary September 15, 1994, determination involving the Peninsula Corridor Joint Powers Board upon indistinguishable underlying facts - both arbitrary and capricious. In support of our position, we incorporate herein by reference our 1995 submissions to the Department. It is apparent from DOL's prior determinations that it would be futile for the Union to formally file objections on this point and we have decided therefore not do so. Still, it is important that the written record reflect that Local 1575 has not agreed to nor otherwise concurred in the appropriateness of the contemplated certification action. Our election to not file a formal objection on these grounds should not be construed to in any way negate or prejudice our opposition to the DOL's intended actions here.

Andrew Hasty
Page 2 of 2
September 2, 2025

Please be advised that, as representative of San Mateo County Transit District ("SAMTRANS") employees, ATU Local 1574 objects to the proposed certification action because the following "raises material issues that may require alternative employee protections" and/or there have been "changes in the legal or factual circumstances that may materially affect the rights or interests of employees." 29 C.F.R. § 215.3(d)(3)(i), (ii).

We object to this grant on the grounds that the Public Employees' Pension Reform Act of 2013 ("PEPRA"), Cal. Gov. Code § 7522 *et. seq.*, precludes the Department of Labor ("DOL") from certifying SAMTRANS' compliance with the condition that it continue collective bargaining rights (49 U.S.C. 5333(b)(2)(B)) in order to be eligible for this federal funding. In the past, DOL has well-articulated the reasons why this is so, including in its attached September 4, 2013, Final Determination regarding Sacramento Regional Transit District Grant Amendments (CA-30-0806-03 and CA-03-0806-04) (included here as Attachment A), its attached August 13, 2015, Final Determination regarding the same grant amendments (Attachment B), and its attached October 28, 2021 Reconsideration regarding eleven grant applications (Attachment C). We hereby incorporate by reference all points made by DOL in the attached documents as the basis for our objections. DOL's March 31, 2025, reversal of its position is contrary to law and longstanding principles applied by the DOL based on *Amalgamated Transit Union v. Donovan*, 767 F.2d 939 (D.C. Cir. 1985).

ATU has also articulated the reasons why PEPRA precludes DOL from certifying the instant grant, due to a failure to meet the condition of 49 U.S.C. 5333(b)(2)(B), in its attached May 22, 2013, Objections to Referral Terms in connection with SAMTRANS Grant (CA-04-0221) (Attachment D) and its attached August 14, 2023, and December 18, 2023 briefs in litigation related to the same eleven grant applications (Attachments E and F). We hereby incorporate by reference all points made in the attached documents as the basis for our objections.

Sincerely,

Daniel B. Smith
General Counsel

hb
Enclosures

c:  LaTrina Meredith, President/Business Agent, ATU Local 192
    Rajvinder Singh, President/Business Agent, ATU Local 265
    Jesse Hunt, President/Business Agent, ATU Local 1555
    Ernie Solero, President/Business Agent, ATU Local 1574
    Shane Weinstein, President/Business Agent, ATU Local 1575
    James Lindsay, IVP
    P. Skinner, SamTrans
    H. Salem, SamTrans
    E. Ng, SamTrans